

**Arbitration and ADR worldwide**

**LCIA ARBITRATION RULES**

**Effective 1 January 1998**

Where any agreement, submission or reference provides in writing and in whatsoever manner for arbitration under the rules of the LCIA or by the Court of the LCIA ("the LCIA Court"), the parties shall be taken to have agreed in writing that the arbitration shall be conducted in accordance with the following rules ("the Rules") or such amended rules as the LCIA may have adopted hereafter to take effect before the commencement of the arbitration. The Rules include the Schedule of Costs in effect at the commencement of the arbitration, as separately amended from time to time by the LCIA Court.

## CONTENTS

| | |
|---|---|
| Article 1 | The Request for Arbitration |
| Article 2 | The Response |
| Article 3 | The LCIA Court and Registrar |
| Article 4 | Notices and Periods of Time |
| Article 5 | Formation of the Arbitral Tribunal |
| Article 6 | Nationality of Arbitrators |
| Article 7 | Party and Other Nominations |
| Article 8 | Three or More Parties |
| Article 9 | Expedited Formation |
| Article 10 | Revocation of Arbitrator's Appointment |
| Article 11 | Nomination and Replacement Arbitrators |
| Article 12 | Majority Power to Continue Proceedings |
| Article 13 | Communications |
| Article 14 | Conduct of the Proceedings |
| Article 15 | Submission of Written Statements and Documents |
| Article 16 | Seat of Arbitration and Place of Hearings |
| Article 17 | Language of Arbitration |
| Article 18 | Party Representation |
| Article 19 | Hearings |
| Article 20 | Witnesses |
| Article 21 | Experts to the Arbitral Tribunal |
| Article 22 | Additional Powers of the Arbitral Tribunal |
| Article 23 | Jurisdiction of the Arbitral Tribunal |
| Article 24 | Deposits |
| Article 25 | Interim and Conservatory Measures |
| Article 26 | The Award |
| Article 27 | Correction of Awards and Additional Awards |
| Article 28 | Arbitration and Legal Costs |
| Article 29 | Decisions by the LCIA Court |
| Article 30 | Confidentiality |
| Article 31 | Exclusion of Liability |
| Article 32 | General Rules |

# EXHIBIT F

## Article 1   The Request for Arbitration

1.1   Any party wishing to commence an arbitration under these Rules ("the Claimant") shall send to the Registrar of the LCIA Court ("the Registrar") a written request for arbitration ("the Request"), containing or accompanied by:

(a)   the names, addresses, telephone, facsimile, telex and e-mail numbers (if known) of the parties to the arbitration and of their legal representatives;

(b)   a copy of the written arbitration clause or separate written arbitration agreement invoked by the Claimant ("the Arbitration Agreement"), together with a copy of the contractual documentation in which the arbitration clause is contained or in respect of which the arbitration arises;

(c)   a brief statement describing the nature and circumstances of the dispute, and specifying the claims advanced by the Claimant against another party to the arbitration ("the Respondent");

(d)   a statement of any matters (such as the seat or language(s) of the arbitration, or the number of arbitrators, or their qualifications or identities) on which the parties have already agreed in writing for the arbitration or in respect of which the Claimant wishes to make a proposal;

(e)   if the Arbitration Agreement calls for party nomination of arbitrators, the name, address, telephone, facsimile, telex and e-mail numbers (if known) of the Claimant's nominee;

(f)   the fee prescribed in the Schedule of Costs (without which the Request shall be treated as not having been received by the Registrar and the arbitration as not having been commenced);

(g)   confirmation to the Registrar that copies of the Request (including all accompanying documents) have been or are being served simultaneously on all other parties to the arbitration by one or more means of service to be identified in such confirmation.

1.2   The date of receipt by the Registrar of the Request shall be treated as the date on which the arbitration has commenced for all purposes. The Request (including all accompanying documents) should be submitted to the Registrar in two copies where a sole arbitrator should be appointed, or, if the parties have agreed or the Claimant considers that three arbitrators should be appointed, in four copies.

## Article 2   The Response

2.1   Within 30 days of service of the Request on the Respondent, (or such lesser period fixed by the LCIA Court), the Respondent shall send to the Registrar a written response to the Request ("the Response"), containing or accompanied by:

(a)   confirmation or denial of all or part of the claims advanced by the Claimant in the Request;

(b)   a brief statement describing the nature and circumstances of any counterclaims advanced by the Respondent against the Claimant;

(c)   comment in response to any statements contained in the Request, as called for under Article 1.1(d), on matters relating to the conduct of the arbitration;

(d)   if the Arbitration Agreement calls for party nomination of arbitrators, the name, address, telephone, facsimile, telex and e-mail numbers (if known) of the Respondent's nominee; and

(e)   confirmation to the Registrar that copies of the Response (including all accompanying documents) have been or are being served simultaneously on all other parties to the arbitration by one or more means of service to be identified in such confirmation.

2.2     The Response (including all accompanying documents) should be submitted to the Registrar in two copies, or if the parties have agreed or the Respondent considers that three arbitrators should be appointed, in four copies.

2.3     Failure to send a Response shall not preclude the Respondent from denying any claim or from advancing a counterclaim in the arbitration.  However, if the Arbitration Agreement calls for party nomination of arbitrators, failure to send a Response or to nominate an arbitrator within time or at all shall constitute an irrevocable waiver of that party's opportunity to nominate an arbitrator.

**Article 3        The LCIA Court and Registrar**

3.1     The functions of the LCIA Court under these Rules shall be performed in its name by the President or a Vice-President of the LCIA Court or by a division of three or five members of the LCIA Court appointed by the President or a Vice-President of the LCIA Court, as determined by the President.

3.2     The functions of the Registrar under these Rules shall be performed by the Registrar or any deputy Registrar of the LCIA Court under the supervision of the LCIA Court.

3.3     All communications from any party or arbitrator to the LCIA Court shall be addressed to the Registrar.

**Article 4        Notices and Periods of Time**

4.1     Any notice or other communication that may be or is required to be given by a party under these Rules shall be in writing and shall be delivered by registered postal or courier service or transmitted by facsimile, telex, e-mail or any other means of telecommunication that provide a record of its transmission.

4.2     A party's last-known residence or place of business during the arbitration shall be a valid address for the purpose of any notice or other communication in the absence of any notification of a change to such address by that party to the other parties, the Arbitral Tribunal and the Registrar.

4.3     For the purpose of determining the date of commencement of a time limit, a notice or other communication shall be treated as having been received on the day it is delivered or, in the case of telecommunications, transmitted in accordance with Articles 4.1 and 4.2.

4.4     For the purpose of determining compliance with a time limit, a notice or other communication shall be treated as having been sent, made or transmitted if it is dispatched in accordance with Articles 4.1 and 4.2 prior to or on the date of the expiration of the time-limit.

4.5     Notwithstanding the above, any notice or communication by one party may be addressed to another party in the manner agreed in writing between them or, failing such agreement, according to the practice followed in the course of their previous dealings or in whatever manner ordered by the Arbitral Tribunal.

4.6     For the purpose of calculating a period of time under these Rules, such period shall begin to run on the day following the day when a notice or other communication is received.  If the last day of such period is an official holiday or a non-business day at the residence or place of business of the addressee, the period is extended until the first business day which follows.  Official holidays or non-business days occurring during the running of the period of time are included in calculating that period.

4.7     The Arbitral Tribunal may at any time extend (even where the period of time has expired) or abridge any period of time prescribed under these Rules or under the Arbitration Agreement for the conduct of the arbitration, including any notice or communication to be served by one party on any other party.

**Article 5        Formation of the Arbitral Tribunal**

5.1     The expression "the Arbitral Tribunal" in these Rules includes a sole arbitrator or all the
        arbitrators where more than one. All references to an arbitrator shall include the
        masculine and feminine. (References to the President, Vice-President and members of
        the LCIA Court, the Registrar or deputy Registrar, expert, witness, party and legal
        representative shall be similarly understood).

5.2     All arbitrators conducting an arbitration under these Rules shall be and remain at all
        times impartial and independent of the parties; and none shall act in the arbitration as
        advocates for any party. No arbitrator, whether before or after appointment, shall advise
        any party on the merits or outcome of the dispute.

5.3     Before appointment by the LCIA Court, each arbitrator shall furnish to the Registrar a
        written resume of his past and present professional positions; he shall agree in writing
        upon fee rates conforming to the Schedule of Costs; and he shall sign a declaration to
        the effect that there are no circumstances known to him likely to give rise to any justified
        doubts as to his impartiality or independence, other than any circumstances disclosed by
        him in the declaration. Each arbitrator shall thereby also assume a continuing duty
        forthwith to disclose any such circumstances to the LCIA Court, to any other members of
        the Arbitral Tribunal and to all the parties if such circumstances should arise after the
        date of such declaration and before the arbitration is concluded.

5.4     The LCIA Court shall appoint the Arbitral Tribunal as soon as practicable after receipt by
        the Registrar of the Response or after the expiry of 30 days following service of the
        Request upon the Respondent if  no Response is received by the Registrar (or such
        lesser period fixed by the LCIA Court).  The LCIA Court may proceed with the formation
        of the Arbitral Tribunal notwithstanding that the Request is incomplete or the Response
        is missing, late or incomplete. A sole arbitrator shall be appointed unless the parties
        have agreed in writing otherwise, or unless the LCIA Court determines that in view of all
        the circumstances of the case a three-member tribunal is appropriate.

5.5     The LCIA Court alone is empowered to appoint arbitrators.
        LCIA Court will appoint arbitrators with due regard for any particular method or criteria of
        selection agreed in writing by the parties.  In selecting arbitrators consideration will be
        given to the nature of the transaction, the nature and circumstances of the dispute, the
        nationality, location and languages of the parties and (if more than two) the number of
        parties.

5.6     In the case of a three-member Arbitral Tribunal, the chairman (who will not be a party-
        nominated arbitrator) shall be appointed by the LCIA Court.

**Article 6        Nationality of Arbitrators**

6.1     Where the parties are of different nationalities, a sole arbitrator or chairman of the
        Arbitral Tribunal shall not have the same nationality as any party unless the parties who
        are not of the same nationality as the proposed appointee all agree in writing otherwise.

6.2     The nationality of parties shall be understood to include that of controlling shareholders
        or interests.

6.3     For the purpose of this Article, a person who is a citizen of two or more states shall be
        treated as a national of each state; and citizens of the European Union shall be treated
        as nationals of its different Member States and shall not be treated as having the same
        nationality.

**Article 7        Party and Other Nominations**

7.1     If the parties have agreed that any arbitrator is to be appointed by one or more of them
        or by any third person, that agreement shall be treated as an agreement to nominate an
        arbitrator for all purposes. Such nominee may only be appointed by the LCIA Court as
        arbitrator subject to his prior compliance with Article 5.3.  The LCIA Court may refuse to

appoint any such nominee if it determines that he is not suitable or independent or impartial.

7.2   Where the parties have howsoever agreed that the Respondent or any third person is to nominate an arbitrator and such nomination is not made within time or at all, the LCIA Court may appoint an arbitrator notwithstanding the absence of the nomination and without regard to any late nomination.  Likewise, if the Request for Arbitration does not contain a nomination by the Claimant where the parties have howsoever agreed that the Claimant or a third person is to nominate an arbitrator, the LCIA Court may appoint an arbitrator notwithstanding the absence of the nomination and without regard to any late nomination.

## Article 8        Three or More Parties

8.1   Where the Arbitration Agreement entitles each party howsoever to nominate an arbitrator, the parties to the dispute number more than two and such parties have not all agreed in writing that the disputant parties represent two separate sides for the formation of the Arbitral Tribunal as Claimant and Respondent respectively, the LCIA Court shall appoint the Arbitral Tribunal without regard to any party's nomination.

8.2   In such circumstances, the Arbitration Agreement shall be treated for all purposes as a written agreement by the parties for the appointment of the Arbitral Tribunal by the LCIA Court.

## Article 9        Expedited Formation

9.1   In exceptional urgency, on or after the commencement of the arbitration, any party may apply to the LCIA Court for the expedited formation of the Arbitral Tribunal, including the appointment of any replacement arbitrator under Articles 10 and 11 of these Rules.

9.2   Such an application shall be made in writing to the LCIA Court, copied to all other parties to the arbitration; and it shall set out the specific grounds for exceptional urgency in the formation of the Arbitral Tribunal.

9.3   The LCIA Court may, in its complete discretion, abridge or curtail any time-limit under these Rules for the formation of the Arbitral Tribunal, including service of the Response and of any matters or documents adjudged to be missing from the Request.  The LCIA Court shall not be entitled to abridge or curtail any other time-limit.

## Article 10       Revocation of Arbitrator's Appointment

10.1   If either (a) any arbitrator gives written notice of his desire to resign as arbitrator to the LCIA Court, to be copied to the parties and the other arbitrators (if any) or (b) any arbitrator dies, falls seriously ill, refuses, or becomes unable or unfit to act, either upon challenge by a party or at the request of the remaining arbitrators, the LCIA Court may revoke that arbitrator's appointment and appoint another arbitrator. The LCIA Court shall decide upon the amount of fees and expenses to be paid for the former arbitrator's services (if any) as it may consider appropriate in all the circumstances.

10.2   If any arbitrator acts in deliberate violation of the Arbitration Agreement (including these Rules) or does not act fairly and  impartially as between the parties or does not conduct or participate in the arbitration proceedings with reasonable diligence, avoiding unnecessary delay or expense, that arbitrator may be considered unfit in the opinion of the LCIA Court.

10.3   An arbitrator may also be challenged by any party if circumstances exist that give rise to justifiable doubts as to his impartiality or independence.  A party may challenge an arbitrator it has nominated, or in whose appointment it has participated, only for reasons of which it becomes aware after the appointment has been made.

10.4   A party who intends to challenge an arbitrator shall, within 15 days of the formation of the Arbitral Tribunal or (if later) after becoming aware of any circumstances referred to in Article 10.1, 10.2 or 10.3, send a written statement of the reasons for its challenge to

5

the LCIA Court,  the Arbitral Tribunal and all other parties.  Unless the challenged arbitrator withdraws or all other parties agree to the challenge within 15 days of receipt of the written statement, the LCIA Court shall decide on the challenge.

**Article 11        Nomination and Replacement of Arbitrators**

11.1    In the event that the LCIA Court determines that any nominee is not suitable or independent or impartial or if an appointed arbitrator is to be replaced for any reason, the LCIA Court shall have a complete discretion to decide whether or not to follow the original nominating process.

11.2    If the LCIA Court should so decide, any opportunity given to a party to make a re-nomination shall be waived if not exercised within 15 days (or such lesser time as the LCIA Court may fix), after which the LCIA Court shall appoint the replacement arbitrator.

**Article 12        Majority Power to Continue Proceedings**

12.1    If any arbitrator on a three-member Arbitral Tribunal refuses or persistently fails to participate in its deliberations, the two other arbitrators shall have the power, upon their written notice of such refusal or failure to the LCIA Court, the parties and the third arbitrator, to continue the arbitration (including the making of any decision, ruling or award), notwithstanding the absence of the third arbitrator.

12.2    In determining whether to continue the arbitration, the two other arbitrators shall take into account the stage of the arbitration, any explanation made by the third arbitrator for his  non-participation and such other matters as they consider appropriate in the circumstances of the case. The reasons for such determination shall be stated in any award, order or other decision made by the two arbitrators without the participation of the third arbitrator.

12.3    In the event that the two other arbitrators determine at any time not to continue the arbitration without the participation of the third arbitrator missing from their deliberations, the two arbitrators shall notify in writing the parties and the LCIA Court of such determination; and in that event, the two arbitrators or any party may refer the matter to the LCIA Court for the revocation of that third arbitrator's appointment and his replacement under Article 10.

**Article 13        Communications between Parties and the Arbitral Tribunal**

13.1    Until the Arbitral Tribunal is formed, all communications between parties and arbitrators shall be made through the Registrar.

13.2    Thereafter, unless and until the Arbitral Tribunal directs that communications shall take place directly between the Arbitral Tribunal and the parties (with simultaneous copies to the Registrar), all written communications between the parties and the Arbitral Tribunal shall continue to be made through the Registrar.

13.3    Where the Registrar sends any written communication to one party on behalf of the Arbitral Tribunal, he shall send a copy to each of the other parties. Where any party sends to the Registrar any communication (including Written Statements and Documents under Article 15), it shall include a copy for each arbitrator; and it shall also send copies direct to all other parties and confirm to the Registrar in writing that it has done so or is doing so.

**Article 14        Conduct of the Proceedings**

14.1    The parties may agree on the conduct of their arbitral proceedings and they are encouraged to do so, consistent with the Arbitral Tribunal's general duties at all times:

(i) to act fairly and impartially as between all parties, giving each a reasonable opportunity of putting its case and dealing with that of its opponent; and

(ii) to adopt procedures suitable to the circumstances of the arbitration, avoiding

6

unnecessary delay or expense, so as to provide a fair and efficient means for the final resolution of the parties' dispute.

Such agreements shall be made by the parties in writing or recorded in writing by the Arbitral Tribunal at the request of and with the authority of the parties.

14.2   Unless otherwise agreed by the parties under Article 14.1, the Arbitral Tribunal shall have the widest discretion to discharge its duties allowed under such law(s) or rules of law as the Arbitral Tribunal may determine to be applicable; and at all times the parties shall do everything necessary for the fair, efficient and expeditious conduct of the arbitration.

14.3   In the case of a three-member Arbitral Tribunal the chairman may, with the prior consent of the other two arbitrators, make procedural rulings alone.

**Article 15      Submission of Written Statements and Documents**

15.1   Unless the parties have agreed otherwise under Article 14.1 or the Arbitral Tribunal should determine differently, the written stage of the proceedings shall be as set out below.

15.2   Within 30 days of receipt of written notification from the Registrar of the formation of the Arbitral Tribunal, the Claimant shall send to the Registrar a Statement of Case setting out in sufficient detail the facts and any contentions of law on which it relies, together with the relief claimed against all other parties, save and insofar as such matters have not been set out in its Request.

15.3   Within 30 days of receipt of the Statement of Case or written notice from the Claimant that it elects to treat the Request as its Statement of Case, the Respondent shall send to the Registrar a Statement of Defence setting out in sufficient detail which of the facts and contentions of law in the Statement of Case or Request (as the case may be) it admits or denies, on what grounds and on what other facts and contentions of law it relies.  Any counterclaims shall be submitted with the Statement of Defence in the same manner as claims are to be set out in the Statement of Case.

15.4   Within 30 days of receipt of the Statement of Defence, the Claimant shall send to the Registrar a Statement of Reply which, where there are any counterclaims, shall include a Defence to Counterclaim in the same manner as a defence is to be set out in the Statement of Defence.

15.5   If the Statement of Reply contains a Defence to Counterclaim, within 30 days of its receipt the Respondent shall send to the Registrar a Statement of Reply to Counterclaim.

15.6   All Statements referred to in this Article shall be accompanied by copies (or, if they are especially voluminous, lists) of all essential documents on which the party concerned relies and which have not previously been submitted by any party, and (where appropriate) by any relevant samples and exhibits.

15.7   As soon as practicable following receipt of the Statements specified in this Article, the Arbitral Tribunal shall proceed in such manner as has been agreed in writing by the parties or pursuant to its authority under these Rules.

15.8   If the Respondent fails to submit a Statement of Defence or the Claimant a Statement of Defence to Counterclaim, or if at any point any party fails to avail itself of the opportunity to present its case in the manner determined by Article 15.2 to 15.6 or directed by the Arbitral Tribunal, the Arbitral Tribunal may nevertheless proceed with the arbitration and make an award.

**Article 16      Seat of Arbitration and Place of Hearings**

16.1   The parties may agree in writing the seat (or legal place) of their arbitration.  Failing such a choice, the seat of arbitration shall be London, unless and until the LCIA Court

7

determines in view of all the circumstances, and after having given the parties an opportunity to make written comment, that another seat is more appropriate.

16.2   The Arbitral Tribunal may hold hearings, meetings and deliberations at any convenient geographical place in its discretion; and if elsewhere than the seat of the arbitration, the arbitration shall be treated as an arbitration conducted at the seat of the arbitration and any award as an award made at the seat of the arbitration for all purposes.

16.3   The law applicable to the arbitration (if any) shall be the arbitration law of the seat of arbitration, unless and to the extent that the parties have expressly agreed in writing on the application of another arbitration law and such agreement is not prohibited by the law of the arbitral seat.

**Article 17     Language of Arbitration**

17.1   The initial language of the arbitration shall be the language of the Arbitration Agreement, unless the parties have agreed in writing otherwise and providing always that a non-participating or defaulting party shall have no cause for complaint if communications to and from the Registrar and the arbitration proceedings are conducted in English.

17.2   In the event that the Arbitration Agreement is written in more than one language, the LCIA Court may, unless the Arbitration Agreement provides that the arbitration proceedings shall be conducted in more than one language, decide which of those languages shall be the initial language of the arbitration.

17.3   Upon the formation of the Arbitral Tribunal and unless the parties have agreed upon the language or languages of the arbitration, the Arbitration Tribunal shall decide upon the language(s) of the arbitration, after giving the parties an opportunity to make written comment and taking into account the initial language of the arbitration and any other matter it may consider appropriate in all the circumstances of the case.

17.4   If any document is expressed in a language other than the language(s) of the arbitration and no translation of such document is submitted by the party relying upon the document, the Arbitral Tribunal or (if the Arbitral Tribunal has not been formed) the LCIA Court may order that party to submit a translation in a form to be determined by the Arbitral Tribunal or the LCIA Court, as the case may be.

**Article 18     Party Representation**

18.1   Any party may be represented by legal practitioners or any other representatives.

18.2   At any time the Arbitral Tribunal may require from any party proof of authority granted to its representative(s) in such form as the Arbitral Tribunal may determine.

**Article 19     Hearings**

19.1   Any party which expresses a desire to that effect has the right to be heard orally before the Arbitral Tribunal on the merits of the dispute, unless the parties have agreed in writing on documents-only arbitration.

19.2   The Arbitral Tribunal shall fix the date, time and physical place of any meetings and hearings in the arbitration, and shall give the parties reasonable notice thereof.

19.3   The Arbitral Tribunal may in advance of any hearing submit to the parties a list of questions which it wishes them to answer with special attention.

19.4   All meetings and hearings shall be in private unless the parties agree otherwise in writing or the Arbitral Tribunal directs otherwise.

19.5   The Arbitral Tribunal shall have the fullest authority to establish time-limits for meetings and hearings, or for any parts thereof.

8

**Article 20    Witnesses**

20.1    Before any hearing, the Arbitral Tribunal may require any party to give notice of the identity of each witness that party wishes to call (including rebuttal witnesses), as well as the subject matter of that witness's testimony, its content and its relevance to the issues in the arbitration.

20.2    The Arbitral Tribunal may also determine the time, manner and form in which such materials should be exchanged between the parties and presented to the Arbitral Tribunal; and it has a discretion to allow, refuse, or limit the appearance of witnesses (whether witness of fact or expert witness).

20.3    Subject to any order otherwise by the Arbitral Tribunal, the testimony of a witness may be presented by a party in written form, either as a signed statement or as a sworn affidavit.

20.4    Subject to Article 14.1 and 14.2, any party may request that a witness, on whose testimony another party seeks to rely, should attend for oral questioning at a hearing before the Arbitral Tribunal. If the Arbitral Tribunal orders that other party to produce the witness and the witness fails to attend the oral hearing without good cause, the Arbitral Tribunal may place such weight on the written testimony (or exclude the same altogether) as it considers appropriate in the circumstances of the case.

20.5    Any witness who gives oral evidence at a hearing before the Arbitral Tribunal may be questioned by each of the parties under the control of the Arbitral Tribunal. The Arbitral Tribunal may put questions at any stage of his evidence.

20.6    Subject to the mandatory provisions of any applicable law, it shall not be improper for any party or its legal representatives to interview any witness or potential witness for the purpose of presenting his testimony in written form or producing him as an oral witness.

20.7    Any individual intending to testify to the Arbitral Tribunal on any issue of fact or expertise shall be treated as a witness under these Rules notwithstanding that the individual is a party to the arbitration or was or is an officer, employee or shareholder of any party.

**Article 21    Experts to the Arbitral Tribunal**

21.1    Unless otherwise agreed by the parties in writing, the Arbitral Tribunal:

(a)    may appoint one or more experts to report to the Arbitral Tribunal on specific issues, who shall be and remain  impartial and independent of the parties throughout the arbitration proceedings; and

(b)    may require a party to give any such expert any relevant information or to provide access to any relevant documents, goods, samples, property or site for inspection by the expert.

21.2    Unless otherwise agreed by the parties in writing, if a party so requests or if the Arbitral Tribunal considers it necessary, the expert shall, after delivery of his written or oral report to the Arbitral Tribunal and the parties, participate in one or more hearings at which the parties shall have the opportunity to question the expert on his report and to present expert witnesses in order to testify on the points at issue.

21.3    The fees and expenses of any expert appointed by the Arbitral Tribunal under this Article shall be paid out of the deposits payable by the parties under Article 24 and shall form part of the costs of the arbitration.

**Article 22    Additional Powers of the Arbitral Tribunal**

22.1    Unless the parties at any time agree otherwise in writing, the Arbitral Tribunal shall have the power, on the application of any party or of its own motion, but in either case only after giving the parties a reasonable opportunity to state their views:

(a)  to allow any party, upon such terms (as to costs and otherwise) as it shall determine, to amend any claim, counterclaim, defence and reply;

(b)  to extend or abbreviate any time-limit provided by the Arbitration Agreement or these Rules for the conduct of the arbitration or by the Arbitral Tribunal's own orders;

(c)  to conduct such enquiries as may appear to the Arbitral Tribunal to be necessary or expedient, including whether and to what extent the Arbitral Tribunal should itself take the initiative in identifying the issues and ascertaining the relevant facts and the law(s) or rules of law applicable to the arbitration, the merits of the parties' dispute and the Arbitration Agreement;

(d)  to order any party to make any property, site or thing under its control and relating to the subject matter of the arbitration available for inspection by the Arbitral Tribunal, any other party, its expert or any expert to the Arbitral Tribunal;

(e)  to order any party to produce to the Arbitral Tribunal, and to the other parties for inspection, and to supply copies of, any documents or classes of documents in their possession, custody or power which the Arbitral Tribunal determines to be relevant;

(f)  to decide whether or not to apply any strict rules of evidence (or any other rules) as to the admissibility, relevance or weight of any material tendered by a party on any matter of fact or expert opinion; and to determine the time, manner and form in which such material should be exchanged between the parties and presented to the Arbitral Tribunal;

(g)  to order the correction of any contract between the parties or the Arbitration Agreement, but only to the extent required to rectify any mistake which the Arbitral Tribunal determines to be common to the parties and then only if and to the extent to which the law(s) or rules of law applicable to the contract or Arbitration Agreement permit such correction; and

(h)  to allow, only upon the application of a party, one or more third persons to be joined in the arbitration as a party provided any such third person and the applicant party have consented thereto in writing, and thereafter to make a single final award, or separate awards, in respect of all parties so implicated in the arbitration;

22.2  By agreeing to arbitration under these Rules, the parties shall be treated as having agreed not to apply to any state court or other judicial authority for any order available from the Arbitral Tribunal under Article 22.1, except with the agreement in writing of all parties.

22.3  The Arbitral Tribunal shall decide the parties' dispute in accordance with the law(s) or rules of law chosen by the parties as applicable to the merits of their dispute. If and to the extent that the Arbitral Tribunal determines that the parties have made no such choice, the Arbitral Tribunal shall apply the law(s) or rules of law which it considers appropriate.

22.4  The Arbitral Tribunal shall only apply to the merits of the dispute principles deriving from "ex aequo et bono", "amiable composition" or "honourable engagement" where the parties have so agreed expressly in writing.

### Article 23        Jurisdiction of the Arbitral Tribunal

23.1  The Arbitral Tribunal shall have the power to rule on its own jurisdiction, including any objection to the initial or continuing existence, validity or effectiveness of the Arbitration Agreement. For that purpose, an arbitration clause which forms or was intended to form part of another agreement shall be treated as an arbitration agreement independent of that other agreement. A decision by the Arbitral Tribunal that such other agreement is non-existent, invalid or ineffective shall not entail ipso jure the non-existence, invalidity or ineffectiveness of the arbitration clause.

23.2  A plea by a Respondent that the Arbitral Tribunal does not have jurisdiction shall be

treated as having been irrevocably waived unless it is raised not later than the Statement of Defence; and a like plea by a Respondent to Counterclaim shall be similarly treated unless it is raised no later than the Statement of Defence to Counterclaim. A plea that the Arbitral Tribunal is exceeding the scope of its authority shall be raised promptly after the Arbitral Tribunal has indicated its intention to decide on the matter alleged by any party to be beyond the scope of its authority, failing which such plea shall also be treated as having been waived irrevocably. In any case, the Arbitral Tribunal may nevertheless admit an untimely plea if it considers the delay justified in the particular circumstances.

23.3 The Arbitral Tribunal may determine the plea to its jurisdiction or authority in an award as to jurisdiction or later in an award on the merits, as it considers appropriate in the circumstances.

23.4 By agreeing to arbitration under these Rules, the parties shall be treated as having agreed not to apply to any state court or other judicial authority for any relief regarding the Arbitral Tribunal's jurisdiction or authority, except with the agreement in writing of all parties to the arbitration or the prior authorisation of the Arbitral Tribunal or following the latter's award ruling on the objection to its jurisdiction or authority.

**Article 24      Deposits**

24.1 The LCIA Court may direct the parties, in such proportions as it thinks appropriate, to make one or several interim or final payments on account of the costs of the arbitration. Such deposits shall be made to and held by the LCIA and from time to time may be released by the LCIA Court to the arbitrator(s), any expert appointed by the Arbitral Tribunal and the LCIA itself as the arbitration progresses.

24.2 The Arbitral Tribunal shall not proceed with the arbitration without ascertaining at all times from the Registrar or any deputy Registrar that the LCIA is in requisite funds.

24.3 In the event that a party fails or refuses to provide any deposit as directed by the LCIA Court, the LCIA Court may direct the other party or parties to effect a substitute payment to allow the arbitration to proceed (subject to any award on costs). In such circumstances, the party paying the substitute payment shall be entitled to recover that amount as a debt immediately due from the defaulting party.

24.4 Failure by a claimant or counterclaiming party to provide promptly and in full the required deposit may be treated by the LCIA Court and the Arbitral Tribunal as a withdrawal of the claim or counterclaim respectively.

**Article 25      Interim and Conservatory Measures**

25.1 The Arbitral Tribunal shall have the power, unless otherwise agreed by the parties in writing, on the application of any party:

(a) to order any respondent party to a claim or counterclaim to provide security for all or part of the amount in dispute, by way of deposit or bank guarantee or in any other manner and upon such terms as the Arbitral Tribunal considers appropriate. Such terms may include the provision by the claiming or counterclaiming party of a cross-indemnity, itself secured in such manner as the Arbitral Tribunal considers appropriate, for any costs or losses incurred by such respondent in providing security. The amount of any costs and losses payable under such cross-indemnity may be determined by the Arbitral Tribunal in one or more awards;

(b) to order the preservation, storage, sale or other disposal of any property or thing under the control of any party and relating to the  subject matter of the arbitration; and

(c) to order on a provisional basis, subject to final determination in an award, any relief which the Arbitral Tribunal would have power to grant in an award, including a provisional order for the payment of money or the disposition of property as between any parties.

11

25.2   The Arbitral Tribunal shall have the power, upon the application of a party, to order any claiming or counterclaiming party to provide security for the legal or other costs of any other party by way of deposit or bank guarantee or in any other manner and upon such terms as the Arbitral Tribunal considers appropriate. Such terms may include the provision by that other party of a cross-indemnity, itself secured in such manner as the Arbitral Tribunal considers appropriate, for any costs and losses incurred by such claimant or counterclaimant in providing security. The amount of any costs and losses payable under such cross-indemnity may be determined by the Arbitral Tribunal in one or more awards. In the event that a claiming or counterclaiming party does not comply with any order to provide security, the Arbitral Tribunal may stay that party's claims or counterclaims or dismiss them in an award.

25.3   The power of the Arbitral Tribunal under Article 25.1 shall not prejudice howsoever any party's right to apply to any state court or other judicial authority for interim or conservatory measures before the formation of the Arbitral Tribunal and, in exceptional cases, thereafter. Any application and any order for such measures after the formation of the Arbitral Tribunal shall be promptly communicated by the applicant to the Arbitral Tribunal and all other parties. However, by agreeing to arbitration under these Rules, the parties shall be taken to have agreed not to apply to any state court or other judicial authority for any order for security for its legal or other costs available from the Arbitral Tribunal under Article 25.2.

### Article 26   The Award

26.1   The Arbitral Tribunal shall make its award in writing and, unless all parties agree in writing otherwise, shall state the reasons upon which its award is based. The award shall also state the date when the award is made and the seat of the arbitration; and it shall be signed by the Arbitral Tribunal or those of its members assenting to it.

26.2   If any arbitrator fails to comply with the mandatory provisions of any applicable law relating to the making of the award, having been given a reasonable opportunity to do so, the remaining arbitrators may proceed in his absence and state in their award the circumstances of the other arbitrator's failure to participate in the making of the award.

26.3   Where there are three arbitrators and the Arbitral Tribunal fails to agree on any issue, the arbitrators shall decide that issue by a majority. Failing a majority decision on any issue, the chairman of the Arbitral Tribunal shall decide that issue.

26.4   If any arbitrator refuses or fails to sign the award, the signatures of the majority or (failing a majority) of the chairman shall be sufficient, provided that the reason for the omitted signature is stated in the award by the majority or chairman.

26.5   The sole arbitrator or chairman shall be responsible for delivering the award to the LCIA Court, which shall transmit certified copies to the parties provided that the costs of arbitration have been paid to the LCIA in accordance with Article 28.

26.6   An award may be expressed in any currency. The Arbitral Tribunal may order that simple or compound interest shall be paid by any party on any sum awarded at such rates as the Arbitral Tribunal determines to be appropriate, without being bound by legal rates of interest imposed by any state court, in respect of any period which the Arbitral Tribunal determines to be appropriate ending not later than the date upon which the award is complied with.

26.7   The Arbitral Tribunal may make separate awards on different issues at different times. Such awards shall have the same status and effect as any other award made by the Arbitral Tribunal.

26.8   In the event of a settlement of the parties' dispute, the Arbitral Tribunal may render an award recording the settlement if the parties so request in writing (a "Consent Award"), provided always that such award contains an express statement that it is an award made by the parties' consent. A Consent Award need not contain reasons. If the parties do not require a consent award, then on written confirmation by the parties to the LCIA Court that a settlement has been reached, the Arbitral Tribunal shall be discharged and

the arbitration proceedings concluded, subject to payment by the parties of any outstanding costs of the arbitration under Article 28.

26.9   All awards shall be final and binding on the parties. By agreeing to arbitration under these Rules, the parties undertake to carry out any award immediately and without any delay (subject only to Article 27); and the parties also waive irrevocably their right to any form of appeal, review or recourse to any state court or other judicial authority, insofar as such waiver may be validly made.

### Article 27   Correction of Awards and Additional Awards

27.1   Within 30 days of receipt of any award, or such lesser period as may be agreed in writing by the parties, a party may by written notice to the Registrar (copied to all other parties) request the Arbitral Tribunal to correct in the award any errors in computation, clerical or typographical errors or any errors of a similar nature. If the Arbitral Tribunal considers the request to be justified, it shall make the corrections within 30 days of receipt of the request. Any correction shall take the form of separate memorandum dated and signed by the Arbitral Tribunal or (if three arbitrators) those of its members assenting to it; and such memorandum shall become part of the award for all purposes.

27.2   The Arbitral Tribunal may likewise correct any error of the nature described in Article 27.1 on its own initiative within 30 days of the date of the award, to the same effect.

27.3   Within 30 days of receipt of the final award, a party may by written notice to the Registrar (copied to all other parties), request the Arbitral Tribunal to make an additional award as to claims or counterclaims presented in the arbitration but not determined in any award. If the Arbitral Tribunal considers the request to be justified, it shall make the additional award within 60 days of receipt of the request. The provisions of Article 26 shall apply to any additional award.

### Article 28   Arbitration and Legal Costs

28.1   The costs of the arbitration (other than the legal or other costs incurred by the parties themselves) shall be determined by the LCIA Court in accordance with the Schedule of Costs. The parties shall be jointly and severally liable to the Arbitral Tribunal and the LCIA for such arbitration costs.

28.2   The Arbitral Tribunal shall specify in the award the total amount of the costs of the arbitration as determined by the LCIA Court. Unless the parties agree otherwise in writing, the Arbitral Tribunal shall determine the proportions in which the parties shall bear all or part of such arbitration costs. If the Arbitral Tribunal has determined that all or any part of the arbitration costs shall be borne by a party other than a party which has already paid them to the LCIA, the latter party shall have the right to recover the appropriate amount from the former party.

28.3   The Arbitral Tribunal shall also have the power to order in its award that all or part of the legal or other costs incurred by a party be paid by another party, unless the parties agree otherwise in writing. The Arbitral Tribunal shall determine and fix the amount of each item comprising such costs on such reasonable basis as it thinks fit.

28.4   Unless the parties otherwise agree in writing, the Arbitral Tribunal shall make its orders on both arbitration and legal costs on the general principle that costs should reflect the parties' relative success and failure in the award or arbitration, except where it appears to the Arbitral Tribunal that in the particular circumstances this general approach is inappropriate. Any order for costs shall be made with reasons in the award containing such order.

28.5   If the arbitration is abandoned, suspended or concluded, by agreement or otherwise, before the final award is made, the parties shall remain jointly and severally liable to pay to the LCIA and the Arbitral Tribunal the costs of the arbitration as determined by the LCIA Court in accordance with the Schedule of Costs. In the event that such arbitration costs are less than the deposits made by the parties, there shall be a refund by the LCIA in such proportion as the parties may agree in writing, or falling such agreement, in the

same proportions as the deposits were made by the parties to the LCIA.

**Article 29      Decisions by the LCIA Court**

29.1    The decisions of the LCIA Court with respect to all matters relating to the arbitration shall be conclusive and binding upon the parties and the Arbitral Tribunal. Such decisions are to be treated as administrative in nature and the LCIA Court shall not be required to give any reasons.

29.2    To the extent permitted by the law of the seat of the arbitration, the parties shall be taken to have waived any right of appeal or review in respect of any such decisions of the LCIA Court to any state court or other judicial authority. If such appeals or review remain possible due to mandatory provisions of any applicable law, the LCIA Court shall, subject to the provisions of that applicable law, decide whether the arbitral proceedings are to continue, notwithstanding an appeal or review.

**Article 30      Confidentiality**

30.1    Unless the parties expressly agree in writing to the contrary, the parties undertake as a general principle to keep confidential all awards in their arbitration, together with all materials in the proceedings created for the purpose of the arbitration and all other documents produced by another party in the proceedings not otherwise in the public domain - save and to the extent that disclosure may be required of a party by legal duty, to protect or pursue a legal right or to enforce or challenge an award in bona fide legal proceedings before a state court or other judicial authority.

30.2    The deliberations of the Arbitral Tribunal are likewise confidential to its members, save and to the extent that disclosure of an arbitrator's refusal to participate in the arbitration is required of the other members of the Arbitral Tribunal under Articles 10, 12 and 26.

30.3    The LCIA Court does not publish any award or any part of an award without the prior written consent of all parties and the Arbitral Tribunal.

**Article 31      Exclusion of Liability**

31.1    None of the LCIA, the LCIA Court (including its President, Vice-Presidents and individual members), the Registrar, any deputy Registrar, any arbitrator and any expert to the Arbitral Tribunal shall be liable to any party howsoever for any act or omission in connection with any arbitration conducted by reference to these Rules, save where the act or omission is shown by that party to constitute conscious and deliberate wrongdoing committed by the body or person alleged to be liable to that party.

31.2    After the award has been made and the possibilities of correction and additional awards referred to in Article 27 have lapsed or been exhausted, neither the LCIA, the LCIA Court (including its President, Vice-Presidents and individual members), the Registrar, any deputy Registrar, any arbitrator or expert to the Arbitral Tribunal shall be under any legal obligation to make any statement to any person about any matter concerning the arbitration, nor shall any party seek to make any of these persons a witness in any legal or other proceedings arising out of the arbitration.

**Article 32      General Rules**

32.1    A party who knows that any provision of the Arbitration Agreement (including these Rules) has not been complied with and yet proceeds with the arbitration without promptly stating its objection to such non-compliance, shall be treated as having irrevocably waived its right to object.

32.2    In all matters not expressly provided for in these Rules, the LCIA Court, the Arbitral Tribunal and the parties shall act in the spirit of these Rules and shall make every reasonable effort to ensure that an award is legally enforceable.

## James Parker

| | |
|---|---|
| **From:** | Casework [casework@lcia.org] |
| **Sent:** | Tuesday, March 09, 2010 12:56 PM |
| **To:** | Kasra Nouroozi; Luke.Irons@stonechambers.com; jkubin@gibbsbruns.com; rgibbs@gibbsbruns.com; rsmith@kslaw.com; waguihESiag@aol.com; rsiag@siagtravel.com; rsiag@siagtravelegypt.com; manamino29@hotmail.com; shumphries@gibbsbruns.com; steven.gee.q.c@btinternet.com |
| **Cc:** | Casework |
| **Subject:** | LCIA Arbitration No. 91491 - King & Spalding LLP vs. Waguih Elie George Siag, et al. |
| **Attachments:** | SIAG Decl Executed Mar 6 2010.pdf; SIAG Dec Exhibit A.PDF; SIAG Dec Exhibit B.PDF; SIAG Dec Exhibit C.PDF; SIAG Dec Exhibit D.PDF; SIAG Dec Exhibit E.PDF; SIAG Dec Exhibit F.PDF; SIAG Dec Exhibit G.PDF; SIAG Dec Exhibit H.PDF; Memo of Law.pdf; Motion to Remand.pdf; Proposed Order.pdf |

Dear Sirs

I acknowledge receipt today of an email from Mishcon de Reya for the first, second, fourth and fifth Respondents (with attachments), copied below for Mr Gee's, the third Respondent's and the Claimant's benefit. Mishcon de Reya are again requested to copy all parties in their correspondence with the LCIA, and to use the above case reference.

The matters raised by Mishcon de Reya in their email relate to Mr Gee's jurisdiction and to the conduct of this arbitration, and are for Mr Gee to decide. We look forward to hearing from him.

Yours faithfully

Remy Gerbay
Deputy Registrar

LCIA
70 Fleet Street
London EC4Y 1EU
Tel:  +44 (0) 20 7936 7007
Fax: +44 (0) 20 7936 7008
www.lcia.org

**From:** Kristianne Benn [mailto:Kristianne.Benn@Mishcon.com] **On Behalf Of** Kasra Nouroozi
**Sent:** 09 March 2010 16:31
**To:** Casework
**Cc:** Kasra Nouroozi
**Subject:** FW: LCIA Arbitration No. 91491 - Claimant's Statement of Case and Hearing on 30th March 2010.

Dear Sir,

We write with reference to Mr Gee's email to the parties dated 8 March 2010.

Please be sure to pass our assurance to Mr Gee that our lack of direct communication with him must not be construed as any sign of disrespect. The simple issue here is that the parties have submitted to the jurisdiction of the US courts. There are substantive proceedings in Texas which will culminate in a ruling by a US judge who will determine whether or not our clients can be compelled to take part in this arbitration. This is a matter which will be interpreted in accordance with US laws and by a US judge who

# EXHIBIT G

6/2/2010

has jurisdiction to make the determination. Until such determination by a US judge, it appears to us that it is a waste of costs, time and resources to participate in any arbitration proceedings. This is without prejudice to our clients' well documented contentions concerning the jurisdiction and suitability of the LCIA.

We attach herewith copies of pleadings, evidence and legal arguments served in the US proceedings. Our understanding is that the US judge will make a determination relating to arbitration within the next few weeks and in our view the sensible and expedient way forward would be for the LCIA proceedings to be stayed pending the decision in the US. We therefore urge you to forward this mail and attachments to Mr Gee because any attendance before him in late March or any other substantive steps in the arbitration will be wasteful at this stage.

Yours faithfully,

Mishcon de Reya

---

**From:** steven gee [mailto:steven.gee.q.c@btinternet.com]
**Sent:** Mon 08 March 2010 21:46
**To:** j-p.schulz@stonechambers.com; luke.irons@stonechambers.com; Kasra Nouroozi; WaguihESiag@aol.com; rsiag@siagtravel.com; rsiag@siagtravelegypt.com; manamino29@hotmail.com; Robin C. Gibbs; Scott A. Humphries; rsmith@kslaw.com; casework@lcia.org; Jeffrey C. Kubin
**Cc:** Jeffrey C. Kubin; casework@lcia.org; Kasra Nouroozi; WaguihESiag@aol.com; rsiag@siagtravel.com; rsiag@siagtravelegypt.com; manamino29@hotmail.com
**Subject:** LCIA Arbitration No. 91491 - Claimant's Statement of Case and Hearing on 30th March 2010.

To: The Parties to the Arbitration and their representatives
From: Mr Steven Gee QC (Sole Arbitrator).

Dear All,
1. I refer to my letter dated 24th February 2010 to the parties and their representatives. I have received that attached from the Claimants on Monday 8th March 2010.
2. No response has been received from any of the Respondents of their representatives to my letter and the email seeking to agree a convenient date to hold the hearing at Stone Chambers. That hearing, which is referred to in my letter dated 24th February 2010, is now fixed for 30th March 2010 at Stone Chambers, 4 Field Court, Gray's Inn, London WC1R 5EF. The hearing will be an oral hearing commencing at 11 am London time.

3. I hope that the Respondents will respond and participate in this Arbitration.

4. I draw attention to section 41 of the Arbitration Act 1996. I would be grateful if the Claimants will take all reasonable steps to ensure that besides this email the Respondents have had notice of the hearing which I have fixed above, and if I could be provided with evidence of what steps have been taken.

5. A party or his representative may attend the hearing through videolink or telephone by arrangements which should be made with my clerk (J-P or Luke at Stone Chambers; telephone 0044-207-440-6900, e mails: j-p.schulz@stonechambers.com; luke.irons@stonechambers.com)

Yours sincerely,
Steven Gee QC

----- Forwarded Message ----
**From:** Jeffrey C. Kubin <jkubin@gibbsbruns.com>
**To:** steven.gee@stonechambers.com; steven.gee.q.c@btinternet.com
**Cc:** j-p.schulz@stonechambers.com; luke.irons@stonechambers.com; kasra.nouroozi@mishcon.com; WaguihESiag@aol.com; rsiag@siagtravel.com; rsiag@siagtravelegypt.com; manamino29@hotmail.com; Robin C. Gibbs <rgibbs@gibbsbruns.com>; Scott A. Humphries <shumphries@gibbsbruns.com>; rsmith@kslaw.com; casework@lcia.org; Jeffrey C. Kubin <jkubin@gibbsbruns.com>
**Sent:** Monday, 8 March, 2010 20:03:07
**Subject:** LCIA Arbitration No. 91491 (Claimant's Statement of Case)

Dear Mr. Gee:

Attached please find:

1. A cover letter to you;
2. Claimant's Statement of Case;
3. Witness Statement of Reggie Smith; and
4. Witness Statement of Ken Fleuriet.

Thank you.

Sincerely yours,

Jeff Kubin
Gibbs & Bruns, L.L.P.

---

## New York, New Office, come and visit

**Mishcon de Reya Solicitors**, Summit House, 12 Red Lion Square, London WC1R 4QD
Tel +44(0)20 7440 7000 Fax +44(0)20 7404 5982 www.mishcon.com

Please consider the environment before printing this e-mail.
This email and any attachment is confidential, may be legally privileged and must not be disclosed to or used by anyone other than the intended recipient. Unauthorised use, disclosure, distribution or copying is prohibited and may be unlawful. If you are not the intended recipient, please notify kasra.nouroozi@mishcon.com and then delete this email.

This email is sent over a public network and its completeness or accuracy cannot be guaranteed. Any attached files were checked with virus detection software before sending, but you should carry out your own virus check before opening them and we do not accept liability for any loss or damage caused by software viruses.

We are a partnership of solicitors of England and Wales regulated by the Solicitors Regulatory Authority (www.sra.org.uk/solicitors/code-of-conduct.page) under SRA number 68218. A list of the partners may be inspected at the above address. Any opinion or advice to clients is given subject to our terms of business.

This email message has been scanned for viruses by Mimecast.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

6/2/2010

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email


**GIBBS&**
**BRUNS**LLP

Jeffrey C. Kubin
Partner
jkubin@gibbsbruns.com
713.751.5223

May 11, 2010

*Via Email: steven.gee@stonechambers.com*
*& steven.gee.g.c@btinternet.com*
Mr. Steven Gee QC
Stone Chambers
4 Field Court, Gray's Inn
London WC1R 5EF
United Kingdom

Re:    LCIA Arbitration No. 91491
       King & Spalding LLP v. Waguih Elie George Siag, *et al.*

Dear Mr. Gee:

Attached please find "Claimant's Application for the Conversion of the Tribunal's Interim Order Dated 30 March 2010 Into An Interim Award" and a draft of the proposed award in WORD format as discussed in Claimant's application.

Claimant urgently requests that the Tribunal review and rule upon this application at its very earliest convenience. In particular, as set forth in its application, Claimant requests that the Tribunal's interim award contain certain additional provisions to ensure its enforceability. Quickly awarding Claimant enforceable conservatory relief in the form of an award is essential to preserve the efficacy of this proceeding in light of Respondents' blatant efforts to avoid this Tribunal's authority and delay these proceedings for the purpose of dissipating or hiding the settlement proceeds prior to any final award being issued.

In this regard, Mr. Patrice d'Herbomez's email to the Tribunal dated 11 May 2010 (as well as Budin & Partners' letter to the Tribunal of the same date on behalf of Respondent Rami Siag) are nothing more than a calculated effort to delay this proceeding by waiting until the last minute to lodge frivolous objections while ignoring every opportunity given by the Tribunal to participate in this proceeding. Respondents' defense strategy is transparent: lay behind the log, ignore the Tribunal's instructions and orders, and then try to say just enough to cause further, unnecessary delay without actually engaging on the merits on any issue. These tactics in and of themselves are compelling evidence of the urgent need for enforceable conservatory relief. Claimant will respond to the substance of Mr. d'Herbomez's email and Budin & Partners' letter in the immediate future via separate correspondence.

# EXHIBIT H

Mr. Steven Gee QC
May 11, 2010
Page 2

Thank you for your attention to this extremely pressing matter.   Hard copies of Claimant's application will be sent to the Tribunal via Federal Express.

Very truly yours,

Jeffrey C. Kubin

JCK/ssb

Mr. Steven Gee QC
May 11, 2010
Page 3

c:     j-p.schulz@stonechambers.com
      luke.irons@stonechambers.com
      kasra.nouroozi@mishcon.com
          &bull;    Counsel for Respondents Waguih Siag, Touristic Investment & Hotels Management (SIAG) S.A.E., and Siag-Taba Co.
          &bull;    Facsimile copy sent to Mr. Kasra Nouroozi at 011-44-20-7404-5982.
      avocats@cabinet-dherbomez.com
          &bull;    Counsel for Respondents Waguih Siag and Touristic Investment & Hotels Management (SIAG) S.A.E.
          &bull;    Facsimile copy sent to Mr. Patrice d'Herbomez at 011-33-1-4503-6309.
      arnauddh@cabinet-dherbomez.com
      budinlaw@budin.ch
          &bull;    Counsel for Respondent Rami Siag
          &bull;    Facsimile copy sent to Mr. Nicolas Ulmer and Mr. Pierre-Andre Beguin at 011-41-22-818-0818.
      WaguihESiag@aol.com
      rsiag@siagtravel.com
      rsiag@siagtravelegypt.com
      manamino29@hotmail.com
      rgibbs@gibbsbruns.com
      shumphries@gibbsbruns.com
      jkubin@gibbsbruns.com
      rsmith@kslaw.com
      casework@lcia.org
          &bull;    Hard copies sent via Federal Express to:
                 London Court of International Arbitration
                 c/o Rémy Gerbay
                 70 Fleet Street
                 London EC4Y 1EU
                 United Kingdom

**LONDON COURT OF INTERNATIONAL ARBITRATION**
**Arbitration No. 91491**

**KING & SPALDING LLP**

Claimant

v.

**WAGUIH ELIE GEORGE SIAG, MONA SIAG, RAMI SIAG, TOURISTIC INVESTMENT & HOTELS MANAGEMENT (SIAG) S.A.E., AND SIAG-TABA CO.**

Respondents

**CLAIMANT'S APPLICATION FOR THE CONVERSION OF THE TRIBUNAL'S INTERIM ORDER DATED 30 MARCH 2010 INTO AN INTERIM AWARD**

11 May 2010

**GIBBS & BRUNS, L.L.P.**
1100 Louisiana, Suite 5300
Houston, Texas 77002
U.S.A.
Telephone: +1 713 650 8805
Fax: +1 713 750 0903
**Counsel for Claimant**

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  FACTUAL BASES FOR THE URGENT CONVERSION OF THE
     TRIBUNAL'S INTERIM ORDER INTO AN INTERIM AWARD ................................ 2

III. CONTENT OF THE REQUESTED INTERIM AWARD ................................................ 7

IV.  PROPOSED FORM OF THE INTERIM AWARD ...................................................... 9

V.   REQUEST FOR RELIEF ...................................................................................... 10

i

## I.   INTRODUCTION

1.      King & Spalding LLP ("King & Spalding" or "Claimant") files this application for the conversion of the Tribunal's Interim Order dated 30 March 2010 (the "Interim Order") into an Interim Award because of (a) Respondents' blatant violation of every instruction in the Interim Order, (b) Respondents' refusal to participate in—and demonstrated contempt for—this proceeding and the authority of this Tribunal, and (c), in particular, Respondent Waguih Siag's egregious noncompliance with Paragraphs 25(D) and (E) of the Interim Order, which require the posting of a US$ 60 million bank guarantee and prohibit the dissipation of assets from Respondents' settlement with Egypt. Respondents' behavior raises grave concerns regarding this Tribunal's ability to render an effective final award on the merits due to the dissipation of assets. Accordingly, Claimant respectfully requests that the Tribunal immediately (i) convert its Interim Order into an Interim Award and (ii) add four terms to that Interim Award to ensure Claimant's ability to enforce its substantive provisions (as originally awarded in the Tribunal's Interim Order).

2.      Without the requested Interim Award, this arbitration may become a futile exercise. As the Tribunal is likely aware, interim orders from arbitral tribunals are not enforceable in most Continental legal systems. By contrast, interim awards are presumptively enforceable and are routinely used in situations, such as the present, in which a respondent refuses to respect a tribunal's interim order of conservatory relief and evidences every intent of ignoring a tribunal's jurisdiction and evading its orders. As a consequence, Claimant respectfully but urgently asks the Tribunal to convert its Interim Order into an Interim Award so that Claimant will be able to secure immediate, meaningful, and enforceable conservatory relief during the pendency of this proceeding.

1

## II.   FACTUAL BASES FOR THE URGENT CONVERSION OF THE TRIBUNAL'S INTERIM ORDER INTO AN INTERIM AWARD

3.      The factual bases for converting the Tribunal's Interim Order into an Interim Award are six-fold, but they all stem from Respondents' intentional failure to abide by this Tribunal's Interim Order and Respondents' demonstrated contempt for the authority and jurisdiction of this Tribunal.  The duty of this Tribunal is to render an effective award.  As set forth below, Respondents' acts unequivocally establish their intent and determination to improperly and in bad faith prevent that from happening.  Claimant requests the Interim Award sought herein to preserve the efficacy of this proceeding and to make enforceable the conservatory relief previously awarded in this Tribunal's Interim Order.   As the Tribunal instructed and informed Respondents in that Order: "The Tribunal intends to issue an Award pursuant to Article 26 of the LCIA Rules giving effect to [its] Interim Order."  Ex. 1 ¶ 25(F) (Interim Order).  Respondents have therefore been on notice, for nearly six weeks, that their failure to comply with the Tribunal's Interim Order would result in the issuance of an Interim Award.  It is time for the Tribunal to render its promised Interim Award, for the following reasons.

4.      First, Respondents failed to provide the first-class London bank guarantee required by Paragraph 25(D) of the Tribunal's Interim Order.  *See id.* ¶ 25(D).  As explained in the Interim Order itself, the purpose of this guarantee was "so that should any award go against Respondents after a full hearing on the merits, any award is not rendered ineffective and nugatory through disposal of the settlement proceeds in the meantime."  *Id.* ¶ 23.  As a result of Respondents' failure to provide the required guarantee, the stated danger of a potential final award being rendered ineffective and nugatory has not been alleviated—in fact, for the reasons

2

set forth below, it has only increased in light of Respondent Waguih Siag's profligate expenditures of the settlement proceeds. The required guarantee was designed to serve an important conservatory purpose in this arbitration. Respondents' refusal to provide it evidences their intent and willingness to hide assets. As a consequence, Claimant seeks an Interim Award in order to enable it to enforce the conservatory measures previously ordered in this Tribunal's Interim Order.

5.      Second, Paragraph 25(E) of the Tribunal's Interim Order states that "Respondents and each of them, whether by themselves, their servants, or agents, or otherwise howsoever, are ordered not to transfer, diminish in value, dispose of, or deal with in any way whatsoever" the proceeds from their settlement with Egypt or any assets acquired using the proceeds from that settlement. *Id.* ¶ 25(E). In direct contravention of that instruction, Respondent Waguih Siag has recently purchased two new Rolls Royce motor cars for himself and his wife ("him" and "hers" vehicles)—a Rolls Royce Ghost and a Rolls Royce Phantom Drophead Coupé. In addition, Mr. Siag is believed to be seriously considering purchasing an €8 million yacht, *The Snapper*, berthed in Cannes. *See* Ex. 2 (information on The Snapper from SuperYachtTimes.com)[1]; Ex. 3 (information on The Snapper from Navis Yacht Charter).[2] Mr. Siag is also engaged in making a number of other frivolous expenditures. These are serious violations of this Tribunal's Interim Order, and they evidence in the most flagrant way that Respondents (and Mr. Waguih Siag in particular) care not a wit about this Tribunal's jurisdiction, their Contract of Representation with Claimant, or their legal and equitable obligations to pay Claimant for the extraordinary services it rendered without payment during the five years of the underlying ICSID arbitration.

---

[1]  Found at www.superyachttimes.com/yachts/details/462.
[2]  Found at www.navis-yacht-charter.com/The_Snapper_Sunseeker_charter.

6.     Third, Respondents failed to produce "all documents . . . relating to or connected with the negotiation, terms of, or conclusion of the agreement to settle the ICSID arbitration" as required by Paragraph 25(A) of the Interim Order. Ex. 1 ¶ 25(A). No documents whatsoever have been produced to date. These documents are important factual evidence in this arbitration that should and could have been timely produced by any Respondent who respected the arbitration process and the authority of this Tribunal.

7.     Fourth, Paragraph 25(B) of the Tribunal's Interim Order requires that each Respondent provide:

> a sworn statement . . . setting forth fully: (i) The terms of the settlement agreement(s) with the Arab Republic of Egypt; (ii) What consideration was to be provided regarding any agreement(s) to settle; (iii) What consideration was in fact or is to be provided in connection with any agreement(s) to settle; (iv) Full details of payments made under any agreement(s) to settle . . . ; (v) What has happened to the proceeds of each such payment, the use of those proceeds, the nature of any asset acquired, its location, [and] the name under which the asset is held . . . ; and (vi) A statement that the disclosures above are full and complete and that the document production required [above] is full and complete.

*Id.* ¶ 25(B). No sworn statements whatsoever have been provided to date. These sworn statements are important because, in addition to the US$ 80 million that Respondents have admitted they received as part of their settlement with Egypt, Claimant believes that other nonmonetary consideration may have been received which should be accounted for in any potential final award in Claimant's favor. In addition, the current location of all assets related to that settlement are necessary for purposes of potential enforcement actions if an award were to be made in Claimant's favor. Again, Respondents' failure to provide these sworn statements evidences a complete disregard for the arbitration process and the authority of this Tribunal as well as an obvious determination to hide information and assets so as to thwart the effectiveness of any final award this Tribunal might enter.

4

8.      Fifth, Respondents failed to file their Statement of Defense by 21 April 2010 as required by Paragraph 27(i) of the Tribunal's Interim Order. *See id.* ¶ 27(i). No Statement of Defense has been filed to date. This is further evidence of Respondents' bad faith, their intent to thwart this Tribunal's jurisdiction and authority, and their unwillingness to defend this arbitration on the merits. Respondents' effective default raises additional concerns about their willingness to engage in activities designed to render nugatory any final award this Tribunal might make.

9.      Sixth, while Respondents have failed to file a Statement of Defense, they have found time to lodge frivolous accusations against the LCIA and this Tribunal. Regarding the LCIA, Respondents have attempted to argue that there is a conflict of interest between themselves and certain members of the LCIA Court despite the fact that the LCIA has on multiple occasions affirmed that no person who has an alleged conflict has participated in any way in this arbitration proceeding. Regarding this Tribunal, Respondent Waguih Siag has accused it of "not tak[ing] into account any of [the] arguments nor the counterclaims of Mr. Siag in the proceedings in Texas while [taking into account] all the positions of King & Spalding," *see* Letter from Patrice d'Herbomez to the LCIA dated 6 April 2010, which is directly contrary to and refuted by the Tribunal's own words in Paragraphs 20 and 22 of the Interim Order, *see* Ex. 1 ¶¶ 20, 22. Mr. Siag also unfairly accused the Tribunal's Interim Order of being "totally unjustified and doubtful." *See* Letter from Patrice d'Herbomez to the LCIA dated 6 April 2010. He has also said that "any decision made by the LCIA and its tribunal will be stained by the factual background, history of conflicts of interest and its unilateral imposition of inapplicable rules." *See* Letter from Patrice d'Herbomez to the LCIA dated 28 April 2010. In short, Respondents' vitriolic and unfounded attacks on the LCIA and this Tribunal are simply more evidence of their unwillingness to engage in fair-minded dispute resolution and their intent to

avoid their legal, contractual, and equitable obligations at all costs—including dissipating and hiding the proceeds of their settlement with Egypt.

10.     Respondents' extraordinary violations of this Tribunal's Interim Order all serve to emphasize Respondents' disregard for this Tribunal's jurisdiction and authority.  They also highlight the danger that any award on the merits by this Tribunal may be rendered nugatory unless Respondents are forced to provide actual security in a form that is enforceable in jurisdictions where Respondents are hiding their assets.

11.     In summary, Claimant requests that the Tribunal convert its Interim Order into an Interim Award for three specific reasons.  First, Respondents have entirely ignored the Tribunal's Interim Order dated 30 March 2010, and in particular, they have left Claimant without the protection of the security ordered by this Tribunal.

12.     Second, Claimant is entitled to interim relief and, in particular, security for any future award on the merits this Tribunal might issue for the reasons set forth in Paragraphs 20-24 of the Interim Order.  *See* Ex. 1 ¶¶ 20-24. As this Tribunal wrote in its Interim Order:

> It would appear on the evidence that interim relief is necessary in the interests of justice to secure the proceeds of the settlement and to provide security so that should any award go against Respondents after a full hearing on the merits, any award is not rendered ineffective and nugatory through disposal of the settlement proceeds in the meantime.  There is on the evidence risk of irreparable harm if interim relief is not granted.  It cannot be said that Claimant's case is not sufficient in strength on the present materials such as to justify refusal of relief. Based on the present evidence the interests of justice require in all the circumstances that interim relief is granted to hold the position so that if an eventual award is made in favour of the Claimant it is not rendered nugatory or ineffective through dissipation of assets, and in particular dissipation made possible through not performing the alleged contract.

*Id.* ¶ 23.  Nothing has changed since 30 March 2010 to lessen the Tribunal's rationale for providing Claimant with interim relief.  On the contrary, the concerns upon which that relief was

granted—as evidenced by Respondents' wholesale failure to comply with the Interim Order granting that relief—have only increased exponentially as set forth above.

13.     Third, in the face of Respondents' refusal to comply with the Tribunal's Interim Order, the only means of obtaining the security ordered therein is for Claimant to take appropriate legal action in the countries where Respondents have and/or are hiding assets.  As the Tribunal is aware, such legal action is only possible with an Interim Award (as opposed to an interim order), because an interim order is generally not enforceable in Continental or other courts.

## III.   CONTENT OF THE REQUESTED INTERIM AWARD

14.     For the reasons set forth above, Claimant asks that the requested Interim Award contain all of the provisions in Paragraphs 25(A), (B), and (D) of the Tribunal's Interim Order. Respectively, those provisions require Respondents to (a) produce their settlement documentation with Egypt, *see* Ex. 1 ¶ 25(A); (b) provide sworn statements regarding the terms of their settlement with Egypt and other matters, *see id.* ¶ 25(B); and (c) provide a first-class London bank guarantee in the amount of US$ 60 million, *see id.* ¶ 25(D).  Respondents have known since 30 March 2010 that these provisions could and would be converted into an Interim Award, as expressly stated in the Interim Order itself: "The Tribunal intends to issue an Award pursuant to Article 26 of the LCIA Rules giving effect to this Interim Order." *Id.* ¶ 25(F).

15.     In order to give complete, enforceable effect to Paragraphs (A), (B), and (D) of the Tribunal's Interim Order, Claimant respectfully asks that four additional terms be added to the requested Interim Award to ensure Claimant's ability to enforce it.

16.     First, in order to force compliance with Paragraph 25(D) of the Tribunal's Interim Order requiring Respondents to provide a US$ 60 million first-class London bank guarantee,

Claimant requests that—if Respondents fail to post such a guarantee within five business days—Respondents instead be ordered to place the sum of US$ 40 million into an escrow account pending the issuance of the Tribunal's final award on the merits.[3]  This measure is necessary because in all likelihood Respondents will fail to provide the required bank guarantee (just as they have failed to provide it to date) and many Continental civil law systems make sharp distinctions between legal obligations "to do" and legal obligations "to pay," such that only the latter are enforceable.  In other words, it may be difficult for Claimant to enforce an obligation to set up a bank guarantee, whereas an obligation to pay money into escrow would be readily enforceable.  Such an escrow could be placed, for instance, with the Paris Bar Association without the need for a written escrow agreement and subject to the Tribunal's final award on the merits directing whether any of those escrow funds should be paid to Claimant or returned to Respondents.  Without this additional escrow provision, Claimant believes it is likely that—even with the issuance of an Interim Award—Respondents will continue to flout their obligation to provide security to Claimant because enforcing a bank guarantee in any Civil law jurisdiction is difficult at best.

17.     Second, in order to force compliance with Paragraphs (A) and (B) of the Tribunal's Interim Order requiring Respondents to produce settlement documentation and sworn statements regarding their settlement, Claimant requests that Respondents be required to pay a

---

[3]  The US$ 40 million figure takes into account the following amounts to be provided as security for any potential award this Tribunal might make in Claimant's favour: (a) 45% of US$ 80 million, which is the amount sought by Claimant from Respondents' known settlement with Egypt; (b) US$ 2,831,791 in unreimbursed expenses incurred by Claimant in the underlying ICSID arbitration as set forth in Paragraphs 100-104 of Claimant's Statement of Case; and (c) potential costs, attorneys' fees, and other expenses sought by Claimant that this Tribunal might award as part of any final award.  The Tribunal will recall that it arrived at its US$ 60 million figure for the first-class London bank guarantee, in part, because Respondents were required by Paragraph 2 of the Contract of Representation to deposit the *entire* settlement amount into Claimant's client escrow account, which they failed to do.  While Claimant would not object to the Tribunal ordering that Respondents escrow that amount as opposed to US$ 40 million, Claimant has elected to be more conservative in its request to the Tribunal regarding the escrow amount.

penalty to Claimant of US$ 100,000 per day, beginning on the date of receipt of the Tribunal's Interim Award, for every calendar day they fail to provide all of the relief ordered in Paragraphs 25(A) and (B) of the Tribunal's Interim Order. This measure is necessary because, while it would be difficult to enforce the "to do" obligations in Paragraphs 25(A) and (B) in any Continental court system, an associated fine is readily enforceable.

18.     Third, Claimant requests that the Tribunal's Interim Award be enforceable and executable severally (or *in solidum*) against each Respondent individually. Claimant believes Respondent Waguih Siag is in possession and/or control of the vast majority, if not all, of the settlement proceeds from Respondents' settlement with the Arab Republic of Egypt. Thus, in order to ensure that the full amount of the security provided for in the Tribunal's Interim Award is actually posted by one or more of Respondents, and particularly Mr. Waguih Siag, Claimant requests that the Interim Award be enforceable severally.

19.     Fourth, Claimant requests that the Tribunal's Interim Award contain language providing for provisional and immediate execution in any jurisdiction so that execution may occur notwithstanding any appeals or challenges that Respondents may lodge to a domestic court enforcing the Interim Award. Such language is necessary in order for the Interim Award itself to be fully effective and for Claimant to obtain the conservatory relief that the Award grants.

## IV.    PROPOSED FORM OF THE INTERIM AWARD

20.     For the convenience of the Tribunal, attached as Exhibit 4 is a proposed form of the Interim Award of Conservatory Relief sought by Claimant. This proposed form of the Interim Award will also be attached as a WORD file to the email transmitting this application to the Tribunal.

## V.    REQUEST FOR RELIEF

21.    For the reasons set forth above and in its previous submissions on interim relief, Claimant respectfully requests that the Tribunal issue an Interim Award of Conservatory Relief in the form attached as Exhibit 4 at its very earliest convenience.

Dated: 11 May 2010

Respectfully submitted,

GIBBS & BRUNS, L.L.P.

Robin C. Gibbs
Scott A. Humphries
Jeffrey C. Kubin
1100 Louisiana, Suite 5300
Houston, Texas 77002
U.S.A.
Attn: Robin C. Gibbs

Telephone: +1 713 650 8805
Fax: +1 713 750 0903
Email:  shumphries@gibbsbruns.com
& jkubin@gibbsbruns.com

Counsel for Claimant

# Exhibit 1

| | |
|---|---|
| **From:** | steven gee [steven.gee.q.c@btinternet.com] |
| **Sent:** | Tuesday, March 30, 2010 2:57 PM |
| **To:** | Casework; Kasra Nouroozi; Luke.Irons@stonechambers.com; Jeffrey C. Kubin; Robin C. Gibbs; rsmith@kslaw.com; waguihESiag@aol.com; rslag@siagtravel.com; rslag@siagtravelegypt.com; manamino29@hotmail.com; Scott A. Humphries |
| **Cc:** | Casework |

**Subject:** Re: LCIA Arbitration No. 91491 - King & Spalding LLP vs. Waguih Elie George Siag, et al.


To: the Parties to the Arbitration below,
and their representatives set out below.
cc LCIA (Rémy Gerbay)

From Mr Steven Gee QC (Sole Arbitrator)


LCIA Arbitration 91491: King & Spalding LLP –v- (1) Waguih Elie George Siag, (2) Mona Elie George Siag, (3) Rami Elie George Siag, (4) Tourist Investment & Hotels Management (SIAG) S.A.E., and (5) Siag Taba Co.

Tuesday, March 30th 2010.


Dear All,

1.     There was an oral hearing today commencing at 11a.m. at Stone Chambers, 4 Field Court, Gray's Inn, London, as scheduled in these arbitral proceedings.


2.     The Respondents other than Mr Rami Elie George Siag are represented by Mishcon de Reya and by email dated 26th March 2010 to the LCIA, which was sent by them also today to the Tribunal, Mishcon de Reya have stated that they were instructed not to attend. They also enclosed a further pleading from the proceedings before the U.S. District Court for the Southern District of Texas (Judge Melinda Harmon). There was an email with attachment dated 9th March 2010 from Mishcon de Reya which the Tribunal has also considered.


3.     Mr Rami Elie George Siag has also sent the Tribunal an email dated 19th March 2010 stating that he was not proposing to attend.


4.     The hearing was attended by counsel for Claimant, Mr. Scott Humphries and Mr. Jeff Kubin of Gibbs & Bruns LLP, and Mr. Reginald Smith of Claimant.


5.     There are proceedings pending before the Federal District Court in the Southern District of Texas in which there are motions pending before Judge Harmon which were taken into account.

6.    In these circumstances it was just to proceed so as to consider:

  A.  The Respondents' position that the Tribunal should adjourn (in Mishcon's email dated 9th March 2010);

  B.  Challenges to the Jurisdiction by the Respondents;

  C.  The Applications for Interim Relief;

  D.  Further scheduling.

7.    In view of the fact that the hearing proceeded in the absence of the Respondents the Tribunal proceeded on the materials which have been served on them in advance of the hearing, and the materials relied upon by the Respondents.

8.    The Respondents deny that there is any binding or effective Contract of Representation or agreement to arbitrate.

(A) Adjournment

9.    The evidence before the Tribunal was of a case in which there was a need to consider each of the matters of Jurisdiction, Interim Relief and Further Scheduling in the Arbitration and where there was a risk of injustice if the Tribunal did not do so. Furthermore the Respondents have been given proper notice of this hearing (the Respondents did not contend otherwise) and they were given the opportunity of attending it by video conference or telephone if they so desired. It seemed to the Tribunal that it was a matter for the Respondents if they wished to attend. The Tribunal declined to adjourn.

(B) Jurisdiction Challenges

10.   At the hearing, it was apparent that the Respondents represented by Mishcon de Reya (who represent all Respondents except Mr. Rami Siag) have raised issues concerning the jurisdiction of the Tribunal. In particular, matters concerning jurisdiction arise from:

  A.  Plaintiff's Original Petition filed in Cause No. 2010-01557 in Harris County District Court on 11 January 2010;

  B.  The Reply Memorandum of Law filed in Cause No. 4:10-CV-367 in U.S. District Court for the Southern District of Texas on 19 March 2010; and

  C.  The Memorandum of Law filed in Cause No. 4:10-CV-367 in U.S. District Court for the Southern District of Texas on 8 March 2010.

11.   The issues concerning jurisdiction relate to (i) the circumstances in which the arbitration agreement in the alleged Contract of Representation was obtained, (ii) the arbitrability of certain issues which arise on the merits in this arbitration, and (iii) matters concerning individuals who are members of the Court of the LCIA.

12.     There was an email from Mr. Rami Siag to the Tribunal dated 19 March 2010 which challenged jurisdiction on the separate grounds concerning him.

13.     The Arbitration Clause in the alleged Contract of Representation provides for the situs of the arbitration to be in Houston, Texas.  Subject to whether this Clause is binding and further submissions, it would seem that if there is a contract to arbitrate it provides that (i) the agreed seat of the Arbitration is in Houston, Texas; and (ii) pursuant to Paragraph 7 of the alleged Contract of Representation, it would seem that the putative proper law of the contract is Texas law subject to submissions to the contrary.

14.     The LCIA Arbitration Rules, which are expressly incorporated into the alleged Contract of Representation, provide for jurisdictional challenges to be dealt with in accordance with Article 23 of those Rules.

15.     The Tribunal reserves to itself the power to decide whether there should be a separate award on jurisdiction alone or a single award on jurisdiction and the underlying merits combined.

16.     Subject to further submissions, the Tribunal is presently minded to make a separate award on jurisdiction because the matters which appear to arise in relation to jurisdiction seem to be discrete points which can be promptly resolved without the need to resolve the entire merits of the underlying dispute.  If the Respondents are correct that is an end to the arbitral proceedings.

17.     The proceedings pending before the U.S. District Court for the Southern District of Texas (Judge Melinda Harmon) raise issues which overlap with Respondents' jurisdictional challenges.  The fact that these issues have been raised and that certain relief is claimed in the U.S. District Court which concerns the arbitration agreement in the Contract of Representation does not in itself make it inappropriate for Respondents' jurisdictional issues to be considered by the Tribunal.  This is what is contemplated by Article 23 of the LCIA Rules and is in accordance with the principles of international arbitration, which allow the Tribunal to inquire into its own jurisdiction when a challenge is made to that jurisdiction.

18.     It has been suggested by the Respondents (Mishcon's email dated 9th March 2010) that it would save costs if the Tribunal waited for the judgment of Judge Harmon on the pending motions before her and/or on the merits of the proceedings pending before the U.S. District Court.  Where a jurisdictional challenge is raised before the Tribunal, the Tribunal should normally proceed to resolve that challenge one way or the other.  This is a case in which the motions pending before Judge Harmon may or may not result in a judgment by Judge Harmon which has application to the issues of jurisdiction raised in this arbitral proceeding.  Any judgment of Judge Harmon will be accorded the utmost respect.  It may be, depending on what happens in the future, that such a judgment will be binding on the parties in relation to the jurisdictional issues, or it may be that this is not the case.  For the moment, the Tribunal considers that progress should be made on the jurisdictional issues in the arbitration.

19.   In relation to the jurisdictional challenges referred to above, the Tribunal directs that

 i.   The Claimant is to provide by email to the Circulation List (for the meaning of this see the Tribunal's Letter dated 24th February 2010) submissions and supporting evidence as soon as possible but in any event by 12 April 2010 by 4p.m. (London Time).

 ii.   The Respondents are to provide their submissions and evidence on each and every jurisdictional challenge that they may have (not confined to those already raised) by email to the Circulation List within 28 days (including Saturdays, Sundays, and national holidays) from the date Claimant actually sends its submission via email in accordance with i above.

 iii.   The Claimant is to provide its reply submissions and evidence as soon as possible but not later than 14 days after the date the Respondents send their submissions in accordance with ii above.

 iv.   The Respondents are to provide their rejoinder submissions and evidence as soon as possible but no later than 14 days after the date Claimant actually sends its submissions in accordance with iii above.

 v.   Subject to further application or directions, the Tribunal may proceed on the basis of such submissions and evidence to make an award on the jurisdictional issues which are covered by those submissions.

(C) Applications for Interim Relief and Order

20.   The Tribunal has reviewed all of the submissions made by Claimant and Respondents (including evidence and exhibits attached to those submissions) since the beginning of this arbitral proceeding, including Claimant's Request for Arbitration and attached exhibits, Claimant's Supplement Request for Interim Relief and attached witness statement and exhibits, Claimant's Statement of Case and attached witness statements and exhibits, Respondents' filings in the U.S. District Court for the Southern District of Texas including all exhibits thereto, Mr. Waguih Siag's Declaration dated 6 March 2010 including Paragraph 29 thereof, and Mishcon de Reya's communications to the LCIA and the Tribunal, and Mr. Rami Siag's email to the Tribunal.

21.   The interim relief application has been considered taking into account the fact that there are jurisdictional challenges and the points raised by the Respondents. In arbitral proceedings it is not appropriate for the tribunal to prejudge the substantive merits of the case.

22.   The Tribunal has paid careful attention to the issues raised by Respondents impugning the validity of the Contract of Representation, the effectiveness of that contract, and whether they are binding on Respondents. These are issues to be resolved on the merits in these arbitration proceedings.

The Tribunal considers that these issues will need to be resolved on the merits after a full hearing, and it would not be correct in any way to prejudge these issues.

23.    It would appear on the evidence that interim relief is necessary in the interests of justice to secure the proceeds of the settlement and to provide security so that should any award go against Respondents after a full hearing on the merits, any award is not rendered ineffective and nugatory through disposal of the settlement proceeds in the meantime. There is on the evidence a risk of irreparable harm if interim relief is not granted. It cannot be said that the Claimant's case is not sufficient in strength on the present materials such as to justify refusal of relief. Based on the present evidence the interests of justice require in all the circumstances that interim relief is granted to hold the position so that if an eventual award is made in favour of the Claimant it is not rendered nugatory or ineffective through dissipation of assets, and in particular dissipation made possible through not performing the alleged contract.

24.    The ICSID arbitration award was for US$ 133 million. There is evidence in the Declaration of Waguih Siag dated 6 March 2010 in the Federal District Court proceedings that the settlement was for US$ 80 million. This is a very substantial sum, which appears to be controlled by one or more of the Respondents. The Respondents have not provided or offered to provide any security out of those proceeds to the Claimant and dispute any obligation to pay the Claimant any fees or disbursements. The Claimant on its best case is only entitled to part of the settlement proceeds. Based on the evidence, I consider that the appropriate sum to order security for is US$ 60 million subject to further order. In particular, this figure can be adjusted following disclosure by the Respondents of the details of the settlement agreement and settlement proceeds.

25.    In these circumstances the Tribunal orders ("the Interim Order") as follows:

> A.  Each Respondent is to disclose and produce copies to the Claimant of all documents within their possession, custody, and power relating to or connected with the negotiation, terms of , or conclusion of the agreement to settle the ICSID arbitration against the Arab Republic of Egypt on or about 16 November 2009, including but not limited to the forgiveness of debt (if any), cancellation or partial cancellation of debt (if any), and any consideration whatsoever in connection with the settlement agreement. This disclosure and production of copies of documents is to be provided to the Claimant within 7 days of the date this Interim Order is sent to Respondents by email.
>
> B.  Each Respondent is to provide a sworn statement to the Claimant to the best of their information or belief setting forth fully: (i) The terms of any settlement agreement(s) with the Arab Republic of Egypt on or about 16 November 2009; (ii) What consideration was to be provided regarding any agreement(s) to settle; (iii) What consideration was in fact or is to be provided in connection with any agreement(s) to settle;(iv) Full details of payments made under any agreement(s) to settle including the name and address of the

bank(s) receiving any settlement payment(s), the date of such payment(s), the name and number of the account(s), the name of the recipient(s), and the amount(s); (v) What has happened to the proceeds of each such payment mentioned in sub-paragraph (iv), setting out, in relation to each payment, the use of those proceeds, the nature of any asset acquired, its location, the name under which the asset is held, and in relation to any money credited to any account the name and address of the bank(s) receiving any settlement payment(s), the date of such payment(s), the name and number of the account (s), the name of the recipient(s), and the amount(s); and (vi) A statement that the disclosures above are full and complete and that the document production required in i above is full and complete.

C.  This sworn disclosure is to be provided to the Claimant within 7 days of this Interim Order being sent to Respondents via email.

D.  The Respondents are to provide security for the amounts in dispute in this arbitration in the amount of US$ 60 million by first-class London bank guarantee payable by the bank on written demand by the Claimant and presentation of an arbitration award in favor of the Claimant, such payment from the guarantee to be in the amount directed in the award, and the guarantee to be available for multiple presentations with an aggregate limit of US$ 60 million in total. The guarantee is to remain valid and effective unless and until exhausted by payment or a direction by the Tribunal that the same be discharged. The expression "first-class London bank guarantee" means a guarantee to be provided by: (a) Barclays Bank PLC, (b) HSBC, (c) Lloyds Bank, or (d) J.P. Morgan Chase. This security is to be provided as soon as possible and in any event within 14 days (including Saturdays, Sundays, and national holidays) from the date this Interim Order is sent to Respondents via email. A draft of the intended first-class London bank guarantee is to provided to the Claimant as soon as possible and in any event within 10 days (including Saturdays, Sundays, and national holidays) from the date this Interim Order is sent to Respondents via email.

E.  The Respondents and each of them, whether by themselves, their servants, or agents, or otherwise howsoever, are ordered not to transfer, diminish in value, dispose of, or deal with in any way whatsoever (a) any proceeds of, or payments made as part of, the settlement of the ICSID arbitration against the Arab Republic of Egypt on or about 16 November 2009 or (b) any assets of whatsoever nature which have been acquired in whole or in part using such proceeds or payments or assets derived from such proceeds or payments pending further order or direction of the Tribunal. Nothing in this Interim Order is to prevent the Respondents from acting pursuant to written permission given in advance by Claimant to deal with such proceeds, payments, or assets. Furthermore, nothing in this Interim Order is to prevent Respondents from using said proceeds,

payments, or assets solely to provide the first-class London bank guarantee ordered above.

F.   The Tribunal intends to issue an Award pursuant to Article 26 of the LCIA Rules giving effect to this Interim Order.

G.   Any party may at any time apply to discharge or vary any of the orders and directions above.

H.   The Interim Order takes effect immediately but will lapse in the event that the Claimant does not provide a letter to the Tribunal and to the Circulation List (other than the Claimant and Gibbs & Bruns LLP) within 7 days of the date this Interim Order is sent to the Claimant by email, agreeing to abide and carry out any order which may hereafter be made by the Tribunal for compensation for loss (if any) caused by the Interim Order should any be sustained by the Respondents or any of them as a result of this Interim Order which in the opinion of the Tribunal the Claimant ought to pay.

(C) Further Scheduling

26.    It seems to the Tribunal that this is a case in which directions can be given for the service of the Statement of Defence on the merits albeit that if the jurisdiction challenges succeed the merits will not arise. The LCIA Rules allow for a single award addressing jurisdiction and merits. The Tribunal is reserving the power to make a separate award on jurisdiction and is proceeding to give directions on both jurisdiction challenges and the resolution of the merits.

27.    The Tribunal orders the following regarding service of the Statement of Defence:

i.   Respondents' time for providing their Statement of Defence (including any counterclaims) is extended from 7 April 2010 to 21 April 2010 with liberty to apply for additional time. The reason for the extension is that Claimant's Statement of Case is extensive. For the avoidance of doubt, such Statement of Defence (including any counterclaims) is to be served without prejudice to Respondents' challenges to jurisdiction.

ii.   The service of the Statement of Defence (including any counterclaims) is not in any way to affect the right of Respondents to continue with their challenges to the Tribunal's jurisdiction.

iii.   The Tribunal reserves the right to set aside or vary these directions by further order.

Yours sincerely,

Steven Gee QC

(Sole Arbitrator)

# Exhibit 2



## The Snapper



| | | | |
|---|---|---|---|
| **Project Name:** | | **Yacht type:** | Motor Yacht |
| **Based concept:** | Sunseeker 37M | **Sub type:** | |
| **Imo:** | | **MMSI:** | |
| **Call sign:** | | **SYT#:** | Y00462 |
| **Flag:** | | **Port of Registry:** | |
| | | | |
| **Length Overall (m):** | 36.89 | **Length Overall (ft):** | 121.03 |
| **Length On Deck (m):** | | **Length On Deck (ft):** | |
| **Length Waterline (m):** | 30.80 | **Length Waterline (ft):** | 101.05 |
| **Beam (m):** | 8.00 | **Beam (ft):** | 26.25 |
| **Draught Max (m):** | 2.40 | **Draught Max (ft):** | 7.87 |
| **Draught Min (m):** | | **Draught Min (ft):** | |
| | | | |
| **Shipyard:** | Sunseeker | **Year:** | 2007 |
| **Hull:** | 37M #1 | **Status:** | Completed |
| **Port:** | Poole, Dorset | **Country:** | United Kingdom |
| **Comment:** | | | |

| | | | |
|---|---|---|---|
| Naval Architect: | Don Shead Yacht Design | | |
| Exterior Designer: | Don Shead Yacht Design, Sunseeker | | |
| Interior Designer: | Sunseeker | | |
| Hull Material: | Composite | Superstructure: | Composite |
| Gross Tonnage: | | Displacement: | 190 |
| Class: | | | |
| Class Comments: | RINA / MCA | | |
| MCA: | No | | |
| | | | |
| Guest Cabins: | | | |
| Guests: | 12 | Max Charter Guests: | |
| Crew Cabins: | | Crew: | 6 |
| | | | |
| Total HP: | | Total KW: | |
| | | | |
| Engines: | 2 x MTU 12V 4000 M90 Diesels | | |
| Max Speed: | 27 | Cruise Speed: | 23 |
| Range: | 1,700 | Propulsion: | Twin Screw |
| | | | |
| Fuel Capacity (Liters): | 27,800 | Fuel Capacity (Gallons): | 7,345 |
| Water Capacity (Liters): | 3,950 | Water Capacity (Gallons): | 1,044 |
| | | | |
| Sail Area: | | | |
| | | | |
| Website: | | | |

## Description

Photos and drawings by Sunseeker.

## Exterior Photos



## Layout & Profile




# Exhibit 3



Yacht Charter Croatia, Greece, luxury yachts, sailing, yachting Mediterranean · NYC

MAY/03/2010.        Home              Sitemap            Contact

About us     Luxury        Yacht charter    Terms &      Routes &       Itinerary     FAQ       Links
             yachts                        Conditions    Destinations

Luxury yachts Greece | Luxury yachts Mediterranean | Crewed sailing yacht charter Greece | Sailing charter Mediterranean

# The Snapper

*download pdf brochure*

Change language:




Book Yacht Now



| | |
|---|---|
| **Length:** | 36.89m ( 121'0 ft ) |
| **Beam:** | 8.00m ( 26'3 ) |
| **Draft:** | 2.40m ( 7'10 ft ) |
| **Built:** | 2006 |
| **Shipyard:** | Sunseeker UK |
| **Cabins:** | 5 |
| **Passenger Capacity:** | 10 |
| **Crew:** | 7 |
| **Speed:** | 15.0 Knots |

Prices indicated are per week or per day per day in Euro or US Dollars, all are subject to change without any notice. Please contact our office for for guideline i.e. informations and availablity.
info@navis yacht charter.com

The Snapper Sunseeker – TriDeck 37 superyacht

Luxury yacht charter France Cote d Azur on board Sunseeker The Snapper.

Entertainment space on the upper and main decks provides endless possibilities for leisure, fun and relaxation. On the sky deck, there's a large hot tub and space for guests, bar and dining area, making it the ideal to enjoy in good weather and stunning views.

The upper deck houses a large saloon, with plenty of comfortable seating, a bar and sliding glass doors that open onto its own private aft cockpit. Below is the capacious main deck, complete with sumptuous lounge, there is full beam dining area with table for 12 made of American black walnut and aft cockpit area.

Accommodation on the 37M Yacht is second to none, both in size and appointment. The full beam master stateroom on the main deck has a king-size berth, an office area, separate toilet room, seating area and entertainment system. The generous en suite has twin basins, spa bath and a separate shower cubicle. Depending on how the owner plans to use the Yacht, there's the option of two twins and two double guest cabins or two twins and an aft master stateroom on the lower deck.

Designed, built and equipped to the highest standards, The Snapper Sunseeker 37M Yacht has Sunseeker's proven deep 'V' hulls which offer good sea keeping qualities and allow for good cruising ranges, making this super yacht easy to handle in different sea conditions and a pleasure to travel on for extended trips.

The Snapper Sunseeker Yacht also has all the features expected on a luxury ocean-going vessel, such as the latest navigation equipment using state of the art technology. Built to the most stringent criteria, computerised engine management systems provide constant fine tuning, which improves efficiency and performance.

Advanced use of hydraulics, optional stabilisers, computer-controlled generators and electrical systems make the The Snapper 37M Yacht safe and reliable over long distances powered with twin diesel engines with a 2 x 2.735 HP MTU 4000.

The Snapper Sunseeker offers a level and style of luxury such as ingenious layout, deluxe features and ultra-spacious accommodation make this a vessel that ten guests plus crew can share comfortably and live aboard for extended periods.

The cunning design of the 37M Yacht enables a crew of up to eight to move freely around the boat without intruding guests, a bonus for owner and guests. For maximum convenience the captain's cabin has direct access to the wheelhouse on the upper deck. The galley and servery area on the main deck gives separate access to crew quarters below, and there is even a separate laundry aft on the lower deck so everyone's privacy is maintained at all times.

The Snapper Sunseeker is owned by Irish Eddie Jordan ex. F1 Team Leader Constructor - Jordan Grand Prix

The Snapper is launched in January 2007. She will then be based in Golfe Juan and available for charter for the Monaco Grand Prix and the Cannes Film Festival and later on in Caribbean.

Click on images below for larger preview:









Technical Specifications :

LOA : 36.89m ( 121'0 ft )
Beam :  8.00m ( 26'3 )
Draft : 2.40m ( 7'10 ft )
Built : 2006/7
Shipyard/Builder : Sunseeker International UK
Type : Sunseeker Yacht 37 TriDeck  – Superyacht
Classification Society : RINA Charter Class 100, A- 1.1 Y
Naval Architect: Don Shead Yacht Design
Exterior Designer: Don Shead Yacht Design
Interior : Sunseeker UK In House Design
Material : Hand -laid GRP – Composite
Engines : 2 x 2.735 HP -  MTU Marine Diesel 4000
Generators : 2 x 70 kW
Bow/Sternthrusters : 100 HP
Air Condition : Entire Yacht with Individual Cabins Controls
Top Speed : 25/26 Knots
Zero-speed stabilizers : YES
Cruise Speed : about 12 -15  Knots
Range : 1.500 Nm
Displacement : 152.000kg Half Load
Fuel capacity . 23200 litres
Fresh -water capacity : 4.950 liters
Guests : 10
Cabins : 5  ( Master + 2 x VIP double + 2 twin )
Crew : 7



Crew accommodation :
1 x captain's double cabin
1 x engineer's double cabin
4 x crew in two cabins



Entertainment equipment (TV and satellite)
Satellite television system – A one-off system (80cm antenna), with a single central decoder
feeding all televisions (without control from each TV) 40'' LCD Televison in Upper Salon, Main
Salon and Master Cabin, 32'' LCD TV in double guests cabins and 26'' LCD in Twin cabins all with
Bose speaker system.
Entertainment system – A surround-sound home entertainment system integrated through the
upper



Communications :
Satellite system – 1 x KVH Tracphone 252 phone system comprising antenna, fixed handset and
connected to onboard telephone system.
Telephone system – Internal telephone system, comprising handsets in all cabins, saloon,
wheelhouse and galley.



Sea Toys :
6m Pascoe tender GP800 and GP1300 Yamaha jetskis Waterskis, monoskis, wakeboards,
kneeboards Inflatable toys (donut) 2 x canoe



*Price table*

**The Snapper**

| Charter Price per week | Terms | APA |
|---|---|---|
| € 120.000 | MYBA | 25% - 30% |



*Yacht details are displayed in good faith and believed to be correct but are not guaranteed. Details*
*to be confirmed by our Yacht Charter Specialists during booking process.*
All information are subject to change without notice. Yacht charter prices are for a one-week
charter or per day. Exact pricing and/ or any other detail will be confirmed in charter contract.
Any applicable taxes are extra.
We use MYBA (Mediterranean Yacht Brokers Association) contract that is designed to standardize
charter terms and protect the Charterer ( You) , the Owner, and the Agent/Broker.
It has standard protections and escalation clauses in case any problems arise.
Once you have signed a MYBA charter contract, you are obligated to pay the entire charter
regardless you actually board the yacht.
In exceptional cases, you may be able to cancel, but monies will be refunded only if the yacht can
be chartered to another client, therefore many we suggest purchase of insurance against
cancellation.
Charter fee is paid in two rates ; 50% of charter fee when the charter contract is signed and 50 %
4 weeks before charter commencement. Extra expenses are charged with Advance Provisioning
Allowance (APA). APA is usually 25 % to 30 % of total charter fee and also depending on your
itinerary, food, beverages etc. Captain will keep accurate records of funds spent during your
charter and at the end of the charter, you will be refunded the difference, or you will asked to pay
more during the cruise if further running costs are incurred.











Contact us | About us | About Croatia | About Greece | Marinas
Luxury Yachts Greece | Luxury Yachts Mediterranean | Crewed sailing charter Greece | Sailing charter Mediterranean | Motor Yachts Croatia
Catamaran charter Croatia | Catamaran charter Greece | Sailing yachts Croatia | Sailing yachts Greece | Bareboat Yacht Charter | Crewed Yacht Charter
Bahamas | Caribbean | Italy, Southern France | Mallorca, Ibiza | Turkey | South-Central Dalmatia | North Dalmatia | Greece
Terms | Conditions | MYBA Contract | HYBA Contract

Copyright © 2004/10. Navis Yacht Charter, all rights reserved.
Privacy Policy / Disclamer

# Exhibit 4

**LCIA Arbitration No. 91491**

**[PROPOSED DRAFT]**
**INTERIM AWARD OF CONSERVATORY RELIEF**

Date: [Insert date]

**BETWEEN**

> Claimant:
> King & Spalding LLP
> 1100 Louisiana Street
> Suite 4000
> Houston, Texas 77002
> USA
> rsmith@kslaw.com
>
>> Represented by:
>> Gibbs & Bruns, L.L.P.
>> 1100 Louisiana, Suite 5300
>> Houston, Texas 77002
>> U.S.A.
>> shumphries@gibbsbruns.com
>> jkubin@gibbsbruns.com

**AND**

> Respondent:
> Waguih Elie George Siag
> 10, rue du Maréchal Foch
> 06400 Cannes
> France
> WaguihESiag@aol.com
>
>> Represented by:
>> Mishcon de Reya
>> Summit House
>> 12 Red Lion Square
>> London WC1R 4QD
>> United Kingdom
>> kasra.nouroozi@mishcon.com
>>
>> AND
>>
>> Maître Patrice d'Herbomez
>> 14, rue Jean Richepin

1

75116 Paris
France
arnauddh@cabinet-dherbomez.com

Respondent:
Mona Elie George Siag
111, Nozha Street
Triumph Square
Heliopolis, Cairo
Egypt
manamino29@hotmail.com
Duly called and notified of all proceedings but not currently represented.

Respondent:
Rami Elie George Siag
59, Mariouteya St.
Sakkara Road
P.O. Box 107
Ahram, Giza
Egypt
rsiag@siagtravel.com
rsiag@siagtravelegypt.com

> Represented by:
> Budin & Partners
> Rue Sénebier 20
> P.O. Box 166
> 1211 Geneva 12
> Switzerland
> budinlaw@budin.ch

Respondent:
Touristic Investment & Hotels Management (SIAG) S.A.E.
59, Mariouteya St.
Sakkara Road
P.O. Box 107
Ahram, Giza
Egypt

> Represented by:
> Mishcon de Reya
> Summit House
> 12 Red Lion Square
> London WC1R 4QD
> United Kingdom
> kasra.nouroozi@mishcon.com

Respondent:
Siag-Taba Co.
59, Mariouteya St.
Sakkara Road
P.O. Box 107
Ahram, Giza
Egypt

Represented by:
Mishcon de Reya
Summit House
12 Red Lion Square
London WC1R 4QD
United Kingdom
kasra.nouroozi@mishcon.com

\* \* \*

1.     This Interim Award of Conservatory Relief is issued pursuant to Articles 25 and 26 of the LCIA Arbitration Rules, and it is based on Article 8 of the Contract of Representation among the parties, which provides:

Any dispute, controversy or claim, whether based on contract, tort, statute, regulations, or otherwise, arising out of or relating in any way to this Contract, the relationship of the parties, or the obligations of the parties, including without limitation, any dispute as to the existence, validity, construction, interpretation, negotiation, fraud-in-the-inducement, performance, non-performance, breach, termination, or enforceability of this Contract, as well as any dispute regarding jurisdiction or arbitrability, shall be resolved through final and binding arbitration, it being the intention of the parties that this is a broad form arbitration agreement designed to encompass all possible disputes among the parties relating to K&S's representation of SIAG in connection with the Dispute. This right to arbitrate the disputes, claims, or controversies under this Contract shall survive the termination of this Agreement.

The arbitration shall be conducted in accordance with the Arbitration Rules of the London Court of International Arbitration as in effect on the date of commencement of the arbitration proceeding.

The arbitration shall be conducted by a sole arbitrator, who will be selected by the parties. If the parties fail to agree on the arbitrator within thirty (30) days after the initiation of the arbitration, then the London Court of International Arbitration shall appoint the arbitrator.

The situs of the arbitration under this Agreement shall be in Houston, Texas, U.S.A. The arbitration proceedings shall be conducted in the English language.

2.      The sole arbitrator, Mr. Steven Gee QC, was appointed by the LCIA on 4 February 2010.

3.      The Tribunal has considered "Claimant's Application for the Conversion of the Tribunal's Interim Order dated 30 March 2010 into an Interim Award," which application is dated 11 May 2010 ("Claimant's Application").

## PROCEDURE AND REASONING

4.      In considering Claimant's Application, the Tribunal has reviewed all of the submissions made by the Claimant and the Respondents (including evidence and exhibits attached to those submissions) since the beginning of this arbitral proceeding, including Claimant's Request for Arbitration and attached exhibits, Claimant's Supplemental Request for Interim Measures and Conservatory Relief and attached witness statement and exhibits, Claimant's Statement of Case and attached witness statements and exhibits, the Respondents' filings in the U.S. District Court for the Southern District of Texas including all exhibits thereto, Mr. Waguih Siag's Declaration dated 6 March 2010 including Paragraph 29 thereof, communications of the Respondents' counsel to the LCIA and the Tribunal, Mr. Rami Siag's email to the Tribunal, and Ms. Mona Siag's email to the Tribunal. *[This is largely taken from Paragraph 20 of the Tribunal's Interim Order with the sole addition being Ms. Mona Siag's email to the Tribunal.]*

5.      Claimant's Application has been considered taking into account the fact that there are jurisdictional challenges and the points raised by the Respondents. In arbitral proceedings it is not appropriate for the tribunal to prejudge the substantive merits of the case. *[This is taken from Paragraph 21 of the Tribunal's Interim Order with only "Claimant's Application" being substituted for "[t]he interim relief application."]*

6.      The Tribunal has paid careful attention to the issues raised by the Respondents impugning the validity of the Contract of Representation, the effectiveness of that contract, and whether they are binding on the Respondents. These are issues to be resolved on the merits in these arbitration proceedings. The Tribunal considers that these issues will need to be resolved on the merits after a full hearing, and it would not be correct in any way to prejudge these issues. *[This is taken verbatim from Paragraph 22 of the Tribunal's Interim Order.]*

7.      As the Tribunal found in its Interim Order, which findings have only become more acute and pressing since the issuance of that Order on 30 March 2010 and the Respondents' failure to comply with that Order, it would appear on the evidence that the interim relief sought in Claimant's Application is necessary in the interests of justice to secure the proceeds of the settlement and to provide security so that should any award go against the Respondents after a full hearing on the merits, any award is not rendered ineffective and nugatory through disposal of the settlement proceeds in the meantime. There is on the evidence substantial risk of irreparable harm if interim relief is not granted. It cannot be said that the Claimant's case is not sufficient in

strength on the present materials such as to justify refusal of relief. Based on the present evidence the interests of justice require in all the circumstances that interim relief is granted in the form of an Award to hold the position so that if an eventual final award is made in favour of the Claimant it is not rendered nugatory or ineffective through dissipation of assets, and in particular dissipation made possible through not performing the alleged contract. *[This is largely taken from Paragraph 23 of the Tribunal's Interim Order.]*

8.      Claimant's Application convincingly explains the need for an Interim Award of Conservatory Relief, the issuance of which was foreseen in Paragraph 25(F) of the Tribunal's Interim Order.

9.      The ICSID arbitration award was for US$ 133 million. There is evidence in the Declaration of Waguih Siag dated 6 March 2010 in the Federal District Court proceedings that the settlement was for US$ 80 million. This is a very substantial sum, which appears to be controlled by one or more of the Respondents. The Respondents have not provided or offered to provide any security out of those proceeds to the Claimant and dispute any obligation to pay the Claimant any fees or disbursements. The Claimant on its best case is only entitled to part of the settlement proceeds. Based on the evidence, I consider that the appropriate sum to order security for is US$ 60 million by way of a bank guarantee or, in the alternative, US$ 40 million by way of sums placed in escrow. *[This is largely taken from Paragraph 24 of the Tribunal's Interim Order.]*

10.     The security to be provided by the Respondents in the amount of US$ 60 million should be made by a first-class London bank guarantee within five (5) business days from the receipt (by email or any other means) of this Award. It would be difficult, if the Respondents fail to provide the required first-class London bank guarantee, for the Claimant to enforce the Respondents' obligation to set up such a bank guarantee in many Continental Civil law systems (where Claimant may seek enforcement of this Award), whereas the obligation to deposit money in an escrow account is readily enforceable. Consequently, if the Respondents fail to establish the bank guarantee within the five (5) business day time limit, their obligation to do so shall lapse, and they shall instead be required to immediately deposit the sum of US$ 40 million into an escrow account maintained by the Bar Association of any jurisdiction where this Award may be executed or enforced. The Claimant will be entitled to enforce and execute the ordered deposit of US$ 40 million by all legal means including with the help of a court in any jurisdiction at the place of execution or enforcement of this Award, which court may order that such sum be placed into appropriate escrow or may, in the alternative, order any similar execution measure legally permissible in the country where execution or enforcement takes place.

11.     The Respondents should also be required to produce the documentation and sworn statements described in Paragraphs 25(A) and (B) of the Tribunal's Interim Order. This information is important in order that both the Tribunal and the Claimant have a complete understanding of the full nature and amount of the Respondents' settlement with the Arab Republic of Egypt as well as what has become of the proceeds from that settlement. In addition, the Claimant is entitled to know about any non-cash portion of the settlement upon which the Claimant might be entitled to damages. This is the most basic of information, and the interests of justice require that it be produced by the Respondents. Given the critical importance of this

information to this proceeding, the Respondents' refusal to provide any of the information to date (despite being ordered to do so in the Tribunal's Interim Order), and the Claimant's potential need to force the Respondents to comply with this obligation, the Tribunal considers it necessary and just that a financial penalty be imposed upon the Respondents for the length of time that they continue to refuse to provide the information.

12.     Because Respondent Waguih Siag is believed to be in possession and/or control of the vast majority, if not all, of the settlement proceeds from the Respondents' settlement with the Arab Republic of Egypt, the Tribunal finds it reasonable and just that this Award should be enforceable and executable against the Respondents severally (or *in solidum*). This is necessary to ensure that the full amount of the security provided for in this Award is posted by one or more of the Respondents and that the Claimant is provided the full protections awarded herein.

13.     The Tribunal further considers that the provisions of this Award should be provisionally and immediately enforceable and executable and should not be suspended by any appeal or challenge that may be lodged against this Award or its enforcement or execution. Immediate enforcement and execution of this Award is merited in light of Respondents' complete failure to comply with the Tribunal's Interim Order, the danger of dissipation of the settlement proceeds necessary to secure any final award on the merits the Tribunal might issue in this proceeding, the need to preserve the efficacy of this proceeding, the danger of irreparable harm to the Claimant if the required security is not provided, and the interests of justice.

## DECISION

14.     In these circumstances, the Tribunal issues the following Interim Award of Conservatory Relief:

a.     Each Respondent is to immediately disclose and produce copies to the Claimant of all documents within their possession, custody, and power relating to or connected with the negotiation, terms of, or conclusion of the agreement to settle the ICSID arbitration against the Arab Republic of Egypt on or about 16 November 2009, including but not limited to the forgiveness of debt (if any), cancellation or partial cancellation of debt (if any), and any consideration whatsoever in connection with the settlement agreement. *[This is taken verbatim from Paragraph 25(A) of the Tribunal's Interim Order with the exception of the addition of the word "immediately."]*

b.     Each Respondent is to immediately provide a sworn statement to the Claimant to the best of their information or belief setting forth fully: (i) The terms of any settlement agreement(s) with the Arab Republic of Egypt on or about 16 November 2009; (ii) What consideration was to be provided regarding any agreement(s) to settle; (iii) What consideration was in fact or is to be provided in connection with any agreement(s) to settle; (iv) Full details of payments made under any agreement(s) to settle

6

including the name and address of the bank(s) receiving any settlement payment(s), the date of such payment(s), the name and number of the account(s), the name of the recipient(s), and the amount(s); (v) What has happened to the proceeds of each such payment mentioned in sub-paragraph (iv), setting out, in relation to each payment, the use of those proceeds, the nature of any asset acquired, its location, the name under which the asset is held, and in relation to any money credited to any account the name and address of the bank(s) receiving any settlement payment(s), the date of such payment(s), the name and number of the account(s), the name of the recipient(s), and the amount(s); and (vi) A statement that the disclosures above are full and complete and that the document production required in Paragraph 14(a) above is full and complete. *[This is taken verbatim from Paragraph 25(B) of the Tribunal's Interim Order with the exception of the addition of the word "immediately."]*

c.   The Respondents are to immediately, and at the latest within five (5) business days from the receipt (by email or any other means) of this Award, provide security for the amounts in dispute in this arbitration in the amount of US$ 60 million by first-class London bank guarantee payable by the bank on written demand by the Claimant and presentation of an arbitration award in favor of the Claimant, such payment from the guarantee to be in the amount directed in the arbitration award, and the guarantee to be available for multiple presentations with an aggregate limit of US$ 60 million in total. The guarantee is to remain valid and effective unless and until exhausted by payment or a direction by the Tribunal that the same be discharged. The expression "first-class London bank guarantee" means a guarantee to be provided by: (a) Barclays Bank PLC, (b) HSBC, (c) Lloyds Bank, or (d) J.P. Morgan Chase. A draft of the intended first-class London bank guarantee is to be provided to the Claimant as soon as possible and in any event within three (3) business days from the receipt (by email or any other means) of this Award. *[This is largely taken from Paragraph 25(D) of the Tribunal's Interim Order.]*

d.   If the first-class London bank guarantee ordered in Paragraph 14(c) above is not provided by the Respondents within five (5) business days from the receipt (by email or any other means) of this Award, the Respondents' obligation to provide such a guarantee shall lapse and the Respondents shall instead immediately deposit the sum of US$ 40 million, or an equivalent sum in another currency calculated at the exchange rate applicable as of the date of this Award, into an escrow account maintained by the Paris Bar Association or by the Bar Association of any jurisdiction where this Award may be executed or enforced. A court in any jurisdiction at the place of execution or enforcement may order that such sum be placed into escrow or may, in the alternative, order any similar execution or enforcement measure. The Tribunal's final award on the

merits will provide specific instructions regarding what portion of the US$ 40 million (or other currency equivalent), if any, should be paid to the Claimant and what portion, if any, should be returned to the Respondents. The Tribunal expressly authorizes the courts of any jurisdiction in which this Award is recognized, enforced, or executed to determine, if need be, the escrow account or similar execution measure that is most suitable to give effect to this paragraph.

e.   The Respondents shall pay a penalty fine of US$ 100,000 per calendar day to the Claimant, beginning on the date of the receipt (by email or any other means) of this Award, for every calendar day they fail to provide all of the relief ordered in Paragraphs 14(a) and (b) above.   The Claimant may periodically apply to the Tribunal for a calculation of the liquidated amount owed by the Respondents to the Claimant under this provision in order to obtain additional interim awards that may be required to enforce or execute the liquidated penalty amount in the appropriate court(s).

f.   This Award shall be enforceable and executable against each Respondent severally (or *in solidum*).

g.   The provisions of this Award are provisionally and immediately executable and shall not be suspended by any appeal or challenge that may be lodged against this Award or its enforcement or execution.

15.   This Award takes effect and is enforceable and executable immediately but will lapse in the event that the Claimant does not provide via email a letter to the Tribunal and the Respondents within five (5) business days from the receipt (by email or any other means) of this Award agreeing to abide by and carry out any order which may hereafter be made by the Tribunal for compensation for loss (if any) caused by this Award should any be sustained by the Respondents or any of them as a result of this Award which in the opinion of the Tribunal the Claimant ought to pay. *[This is largely taken from Paragraph 25(H) of the Tribunal's Interim Order.]*

Deemed to be rendered in Houston, Texas, U.S.A. pursuant to Article 16.2 of the LCIA Arbitration Rules on ░░░ May 2010.


Steven Gee QC
Sole Arbitrator

**LCIA Arbitration No. 91491**

**[PROPOSED DRAFT]**
**INTERIM AWARD OF CONSERVATORY RELIEF**

Date: **[insert date]**

**BETWEEN**

Claimant:
King & Spalding LLP
1100 Louisiana Street
Suite 4000
Houston, Texas 77002
USA
rsmith@kslaw.com

> Represented by:
> Gibbs & Bruns, L.L.P.
> 1100 Louisiana, Suite 5300
> Houston, Texas 77002
> U.S.A.
> shumphries@gibbsbruns.com
> jkubin@gibbsbruns.com

**AND**

Respondent:
Waguih Elie George Siag
10, rue du Maréchal Foch
06400 Cannes
France
WaguihESiag@aol.com

> Represented by:
> Mishcon de Reya
> Summit House
> 12 Red Lion Square
> London WC1R 4QD
> United Kingdom
> kasra.nouroozi@mishcon.com

> AND

> Maître Patrice d'Herbomez
> 14, rue Jean Richepin

1

75116 Paris
France
arnauddh@cabinet-dherbomez.com

Respondent:
Mona Elie George Siag
111, Nozha Street
Triumph Square
Heliopolis, Cairo
Egypt
manamino29@hotmail.com
Duly called and notified of all proceedings but not currently represented.

Respondent:
Rami Elie George Siag
59, Mariouteya St.
Sakkara Road
P.O. Box 107
Ahram, Giza
Egypt
rsiag@siagtravel.com
rsiag@siagtravelegypt.com

    Represented by:
    Budin & Partners
    Rue Sénebier 20
    P.O. Box 166
    1211 Geneva 12
    Switzerland
    budinlaw@budin.ch

Respondent:
Touristic Investment & Hotels Management (SIAG) S.A.E.
59, Mariouteya St.
Sakkara Road
P.O. Box 107
Ahram, Giza
Egypt

    Represented by:
    Mishcon de Reya
    Summit House
    12 Red Lion Square
    London WC1R 4QD
    United Kingdom
    kasra.nouroozi@mishcon.com

Respondent:
Siag-Taba Co.
59, Mariouteya St.
Sakkara Road
P.O. Box 107
Ahram, Giza
Egypt

Represented by:
Mishcon de Reya
Summit House
12 Red Lion Square
London WC1R 4QD
United Kingdom
kasra.nouroozi@mishcon.com

* * *

1.      This Interim Award of Conservatory Relief is issued pursuant to Articles 25 and 26 of the LCIA Arbitration Rules, and it is based on Article 8 of the Contract of Representation among the parties, which provides:

Any dispute, controversy or claim, whether based on contract, tort, statute, regulations, or otherwise, arising out of or relating in any way to this Contract, the relationship of the parties, or the obligations of the parties, including without limitation, any dispute as to the existence, validity, construction, interpretation, negotiation, fraud-in-the-inducement, performance, non-performance, breach, termination, or enforceability of this Contract, as well as any dispute regarding jurisdiction or arbitrability, shall be resolved through final and binding arbitration, it being the intention of the parties that this is a broad form arbitration agreement designed to encompass all possible disputes among the parties relating to K&S's representation of SIAG in connection with the Dispute. This right to arbitrate the disputes, claims, or controversies under this Contract shall survive the termination of this Agreement.

The arbitration shall be conducted in accordance with the Arbitration Rules of the London Court of International Arbitration as in effect on the date of commencement of the arbitration proceeding.

The arbitration shall be conducted by a sole arbitrator, who will be selected by the parties. If the parties fail to agree on the arbitrator within thirty (30) days after the initiation of the arbitration, then the London Court of International Arbitration shall appoint the arbitrator.

The situs of the arbitration under this Agreement shall be in Houston, Texas, U.S.A. The arbitration proceedings shall be conducted in the English language.

2.    The sole arbitrator, Mr. Steven Gee QC, was appointed by the LCIA on 4 February 2010.

3.    The Tribunal has considered "Claimant's Application for the Conversion of the Tribunal's Interim Order dated 30 March 2010 into an Interim Award," which application is dated 11 May 2010 ("Claimant's Application").

## PROCEDURE AND REASONING

4.    In considering Claimant's Application, the Tribunal has reviewed all of the submissions made by the Claimant and the Respondents (including evidence and exhibits attached to those submissions) since the beginning of this arbitral proceeding, including Claimant's Request for Arbitration and attached exhibits, Claimant's Supplemental Request for Interim Measures and Conservatory Relief and attached witness statement and exhibits, Claimant's Statement of Case and attached witness statements and exhibits, the Respondents' filings in the U.S. District Court for the Southern District of Texas including all exhibits thereto, Mr. Waguih Siag's Declaration dated 6 March 2010 including Paragraph 29 thereof, communications of the Respondents' counsel to the LCIA and the Tribunal, Mr. Rami Siag's email to the Tribunal, and Ms. Mona Siag's email to the Tribunal. *[This is largely taken from Paragraph 20 of the Tribunal's Interim Order with the sole addition being Ms. Mona Siag's email to the Tribunal.]*

5.    Claimant's Application has been considered taking into account the fact that there are jurisdictional challenges and the points raised by the Respondents. In arbitral proceedings it is not appropriate for the tribunal to prejudge the substantive merits of the case. *[This is taken from Paragraph 21 of the Tribunal's Interim Order with only "Claimant's Application" being substituted for "[t]he interim relief application."]*

6.    The Tribunal has paid careful attention to the issues raised by the Respondents impugning the validity of the Contract of Representation, the effectiveness of that contract, and whether they are binding on the Respondents. These are issues to be resolved on the merits in these arbitration proceedings. The Tribunal considers that these issues will need to be resolved on the merits after a full hearing, and it would not be correct in any way to prejudge these issues. *[This is taken verbatim from Paragraph 22 of the Tribunal's Interim Order.]*

7.    As the Tribunal found in its Interim Order, which findings have only become more acute and pressing since the issuance of that Order on 30 March 2010 and the Respondents' failure to comply with that Order, it would appear on the evidence that the interim relief sought in Claimant's Application is necessary in the interests of justice to secure the proceeds of the settlement and to provide security so that should any award go against the Respondents after a full hearing on the merits, any award is not rendered ineffective and nugatory through disposal of the settlement proceeds in the meantime. There is on the evidence substantial risk of irreparable harm if interim relief is not granted. It cannot be said that the Claimant's case is not sufficient in

strength on the present materials such as to justify refusal of relief. Based on the present evidence the interests of justice require in all the circumstances that interim relief is granted in the form of an Award to hold the position so that if an eventual final award is made in favour of the Claimant it is not rendered nugatory or ineffective through dissipation of assets, and in particular dissipation made possible through not performing the alleged contract. *[This is largely taken from Paragraph 23 of the Tribunal's Interim Order.]*

8.     Claimant's Application convincingly explains the need for an Interim Award of Conservatory Relief, the issuance of which was foreseen in Paragraph 25(F) of the Tribunal's Interim Order.

9.     The ICSID arbitration award was for US$ 133 million. There is evidence in the Declaration of Waguih Siag dated 6 March 2010 in the Federal District Court proceedings that the settlement was for US$ 80 million. This is a very substantial sum, which appears to be controlled by one or more of the Respondents. The Respondents have not provided or offered to provide any security out of those proceeds to the Claimant and dispute any obligation to pay the Claimant any fees or disbursements. The Claimant on its best case is only entitled to part of the settlement proceeds. Based on the evidence, I consider that the appropriate sum to order security for is US$ 60 million by way of a bank guarantee or, in the alternative, US$ 40 million by way of sums placed in escrow. *[This is largely taken from Paragraph 24 of the Tribunal's Interim Order.]*

10.     The security to be provided by the Respondents in the amount of US$ 60 million should be made by a first-class London bank guarantee within five (5) business days from the receipt (by email or any other means) of this Award. It would be difficult, if the Respondents fail to provide the required first-class London bank guarantee, for the Claimant to enforce the Respondents' obligation to set up such a bank guarantee in many Continental Civil law systems (where Claimant may seek enforcement of this Award), whereas the obligation to deposit money in an escrow account is readily enforceable. Consequently, if the Respondents fail to establish the bank guarantee within the five (5) business day time limit, their obligation to do so shall lapse, and they shall instead be required to immediately deposit the sum of US$ 40 million into an escrow account maintained by the Bar Association of any jurisdiction where this Award may be executed or enforced. The Claimant will be entitled to enforce and execute the ordered deposit of US$ 40 million by all legal means including with the help of a court in any jurisdiction at the place of execution or enforcement of this Award, which court may order that such sum be placed into appropriate escrow or may, in the alternative, order any similar execution measure legally permissible in the country where execution or enforcement takes place.

11.     The Respondents should also be required to produce the documentation and sworn statements described in Paragraphs 25(A) and (B) of the Tribunal's Interim Order. This information is important in order that both the Tribunal and the Claimant have a complete understanding of the full nature and amount of the Respondents' settlement with the Arab Republic of Egypt as well as what has become of the proceeds from that settlement. In addition, the Claimant is entitled to know about any non-cash portion of the settlement upon which the Claimant might be entitled to damages. This is the most basic of information, and the interests of justice require that it be produced by the Respondents. Given the critical importance of this

information to this proceeding, the Respondents' refusal to provide any of the information to date (despite being ordered to do so in the Tribunal's Interim Order), and the Claimant's potential need to force the Respondents to comply with this obligation, the Tribunal considers it necessary and just that a financial penalty be imposed upon the Respondents for the length of time that they continue to refuse to provide the information.

12.     Because Respondent Waguih Siag is believed to be in possession and/or control of the vast majority, if not all, of the settlement proceeds from the Respondents' settlement with the Arab Republic of Egypt, the Tribunal finds it reasonable and just that this Award should be enforceable and executable against the Respondents severally (or *in solidum*). This is necessary to ensure that the full amount of the security provided for in this Award is posted by one or more of the Respondents and that the Claimant is provided the full protections awarded herein.

13.     The Tribunal further considers that the provisions of this Award should be provisionally and immediately enforceable and executable and should not be suspended by any appeal or challenge that may be lodged against this Award or its enforcement or execution. Immediate enforcement and execution of this Award is merited in light of Respondents' complete failure to comply with the Tribunal's Interim Order, the danger of dissipation of the settlement proceeds necessary to secure any final award on the merits the Tribunal might issue in this proceeding, the need to preserve the efficacy of this proceeding, the danger of irreparable harm to the Claimant if the required security is not provided, and the interests of justice.

## DECISION

14.     In these circumstances, the Tribunal issues the following Interim Award of Conservatory Relief:

a.     Each Respondent is to immediately disclose and produce copies to the Claimant of all documents within their possession, custody, and power relating to or connected with the negotiation, terms of, or conclusion of the agreement to settle the ICSID arbitration against the Arab Republic of Egypt on or about 16 November 2009, including but not limited to the forgiveness of debt (if any), cancellation or partial cancellation of debt (if any), and any consideration whatsoever in connection with the settlement agreement.    *[This is taken verbatim from Paragraph 25(A) of the Tribunal's Interim Order with the exception of the addition of the word "immediately."]*

b.     Each Respondent is to immediately provide a sworn statement to the Claimant to the best of their information or belief setting forth fully: (i) The terms of any settlement agreement(s) with the Arab Republic of Egypt on or about 16 November 2009; (ii) What consideration was to be provided regarding any agreement(s) to settle; (iii) What consideration was in fact or is to be provided in connection with any agreement(s) to settle; (iv) Full details of payments made under any agreement(s) to settle

including the name and address of the bank(s) receiving any settlement payment(s), the date of such payment(s), the name and number of the account(s), the name of the recipient(s), and the amount(s); (v) What has happened to the proceeds of each such payment mentioned in sub-paragraph (iv), setting out, in relation to each payment, the use of those proceeds, the nature of any asset acquired, its location, the name under which the asset is held, and in relation to any money credited to any account the name and address of the bank(s) receiving any settlement payment(s), the date of such payment(s), the name and number of the account(s), the name of the recipient(s), and the amount(s); and (vi) A statement that the disclosures above are full and complete and that the document production required in Paragraph 14(a) above is full and complete. *[This is taken verbatim from Paragraph 25(B) of the Tribunal's Interim Order with the exception of the addition of the word "immediately."]*

c.    The Respondents are to immediately, and at the latest within five (5) business days from the receipt (by email or any other means) of this Award, provide security for the amounts in dispute in this arbitration in the amount of US$ 60 million by first-class London bank guarantee payable by the bank on written demand by the Claimant and presentation of an arbitration award in favor of the Claimant, such payment from the guarantee to be in the amount directed in the arbitration award, and the guarantee to be available for multiple presentations with an aggregate limit of US$ 60 million in total. The guarantee is to remain valid and effective unless and until exhausted by payment or a direction by the Tribunal that the same be discharged. The expression "first-class London bank guarantee" means a guarantee to be provided by: (a) Barclays Bank PLC, (b) HSBC, (c) Lloyds Bank, or (d) J.P. Morgan Chase. A draft of the intended first-class London bank guarantee is to be provided to the Claimant as soon as possible and in any event within three (3) business days from the receipt (by email or any other means) of this Award. *[This is largely taken from Paragraph 25(D) of the Tribunal's Interim Order.]*

d.    If the first-class London bank guarantee ordered in Paragraph 14(c) above is not provided by the Respondents within five (5) business days from the receipt (by email or any other means) of this Award, the Respondents' obligation to provide such a guarantee shall lapse and the Respondents shall instead immediately deposit the sum of US$ 40 million, or an equivalent sum in another currency calculated at the exchange rate applicable as of the date of this Award, into an escrow account maintained by the Paris Bar Association or by the Bar Association of any jurisdiction where this Award may be executed or enforced. A court in any jurisdiction at the place of execution or enforcement may order that such sum be placed into escrow or may, in the alternative, order any similar execution or enforcement measure. The Tribunal's final award on the

merits will provide specific instructions regarding what portion of the US$ 40 million (or other currency equivalent), if any, should be paid to the Claimant and what portion, if any, should be returned to the Respondents. The Tribunal expressly authorizes the courts of any jurisdiction in which this Award is recognized, enforced, or executed to determine, if need be, the escrow account or similar execution measure that is most suitable to give effect to this paragraph.

e. The Respondents shall pay a penalty fine of US$ 100,000 per calendar day to the Claimant, beginning on the date of the receipt (by email or any other means) of this Award, for every calendar day they fail to provide all of the relief ordered in Paragraphs 14(a) and (b) above. The Claimant may periodically apply to the Tribunal for a calculation of the liquidated amount owed by the Respondents to the Claimant under this provision in order to obtain additional interim awards that may be required to enforce or execute the liquidated penalty amount in the appropriate court(s).

f. This Award shall be enforceable and executable against each Respondent severally (or *in solidum*).

g. The provisions of this Award are provisionally and immediately executable and shall not be suspended by any appeal or challenge that may be lodged against this Award or its enforcement or execution.

15.   This Award takes effect and is enforceable and executable immediately but will lapse in the event that the Claimant does not provide via email a letter to the Tribunal and the Respondents within five (5) business days from the receipt (by email or any other means) of this Award agreeing to abide by and carry out any order which may hereafter be made by the Tribunal for compensation for loss (if any) caused by this Award should any be sustained by the Respondents or any of them as a result of this Award which in the opinion of the Tribunal the Claimant ought to pay. *[This is largely taken from Paragraph 25(H) of the Tribunal's Interim Order.]*

Deemed to be rendered in Houston, Texas, U.S.A. pursuant to Article 16.2 of the LCIA Arbitration Rules on _____ May 2010.

Steven Gee QC
Sole Arbitrator

Message

## James Parker

| | |
|---|---|
| **From:** | Luke Irons [Luke.Irons@stonechambers.com] |
| **Sent:** | Thursday, May 27, 2010 9:55 AM |
| **To:** | 'Jeffrey C. Kubin'; 'steven gee'; 'Huguenin'; 'Casework'; steven.gee@stonechambers.com; Kasra Nouroozi; WaguihESiag@aol.com; rsiag@siagtravelegypt.com; manamino29@hotmail.com; 'Robin C. Gibbs'; 'Scott A. Humphries'; rsmith@kslaw.com; arnauddh@cabinet-dherbomez.com; avocats@cabinet-dherbomez.com; 'BEGUIN Pierre-André'; 'ULMER Nicolas'; 'BEGUIN Thomas' |
| **Subject:** | RE: LCIA Arb. No. 91491: King & Spalding LLP v. Waguih Elie George Siag, et al. |
| **Attachments:** | Footer.txt |

Dear All,

Further to the email correspondence below the arbitrator has ordered that all parties submit their dates of availability between Monday 21st June and Friday 9th July 2010 inclusive, in order to fix a one day jurisdiction hearing.

At the same point could the parties please confirm if they will be (1) attending in person (2) attending by telephone (3) attending by video link?

These dates must be submitted to me by 4.00pm (GMT) on Tuesday 1st June 2010 and the hearing date will be fixed on Wednesday 2nd June 2010 and all parties will be informed of the date then.

I look forward to hearing from each party and if you have any queries please do not hesitate to contact me.

Kind regards

Luke Irons
Clerk to Mr Steven Gee QC

**From:** Jeffrey C. Kubin [mailto:jkubin@gibbsbruns.com]
**Sent:** 26 May 2010 16:54
**To:** steven gee; Huguenin; Casework; steven.gee@stonechambers.com; j-p.schulz@stonechambers.com; luke.irons@stonechambers.com; kasra.nouroozi@mishcon.com; WaguihESiag@aol.com; rsiag@siagtravelegypt.com; manamino29@hotmail.com; Robin C. Gibbs; Scott A. Humphries; rsmith@kslaw.com; arnauddh@cabinet-dherbomez.com; avocats@cabinet-dherbomez.com; BEGUIN Pierre-André; ULMER Nicolas; BEGUIN Thomas; Jeffrey C. Kubin
**Subject:** RE: LCIA Arb. No. 91491: King & Spalding LLP v. Waguih Elie George Siag, et al.

Dear Mr. Gee:

Pursuant to Paragraph 5 of your email below, in the month of June, counsel for Claimant is available on any of June 21-25 for a hearing on jurisdiction, and we will work to make ourselves available on other dates depending on the Tribunal's schedule (if necessary). Claimant would like to have this hearing as soon as possible, as the Tribunal itself notes.

Thank you for your attention to this matter.

Jeff Kubin
Gibbs & Bruns, L.L.P.
Counsel for Claimant

## EXHIBIT I

Message

-----Original Message-----
**From:** steven gee [mailto:steven.gee.q.c@btinternet.com]
**Sent:** Monday, May 24, 2010 2:37 PM
**To:** Huguenin; Jeffrey C. Kubin; Casework; steven.gee@stonechambers.com; j-p.schulz@stonechambers.com; luke.irons@stonechambers.com; kasra.nouroozi@mishcon.com; WaguihESiag@aol.com; rsiag@siagtravelegypt.com; manamino29@hotmail.com; Robin C. Gibbs; Scott A. Humphries; rsmith@kslaw.com; arnauddh@cabinet-dherbomez.com; avocats@cabinet-dherbomez.com; BEGUIN Pierre-André; ULMER Nicolas; BEGUIN Thomas
**Subject:** Re: LCIA Arb. No. 91491: King & Spalding LLP v. Waguih Elie George Siag, et al.

<u>LCIA Arbitration 91491: King & Spalding LLP –v- (1) Waguih Elie George Siag, (2) Mona Elie George Siag, (3) Rami Elie George Siag, (4) Tourist Investment & Hotels Management (SIAG) S.A.E., and (5) Siag Taba Co.</u>

Dear All,

1. I have responded separately to the request dated 11th May 2010 for revocation of my appointment from Maitre Patrice d'Herbomez on behalf of Touristic Investment & Hotels Management (Siag) S.A.E. I have declined the invitation to withdraw.

2. I have received the letter of 19th May 2010 from Budin et Associes (hereafter "Budin") on behalf of Mr Rami Siag, and the correspondence from the Claimants.

3. Directions were given by the Tribunal on 30th March 2010 in paragraphs 10-19 for the Jurisdiction Challenges. As far as the Tribunal is aware the directions in paragraph 19 (i) have been followed by the Claimants, and the Respondents and each of them have not complied with paragraph 19(ii).

4. The letter dated 19th May 2010 from Budin has no proposal from Budin in relation to a date for provision of their submissions and evidence on each and every jurisdictional challenge that they may have (not confined to those already raised).

5. Subject to further directions I direct that there be an oral hearing to take place as soon as possible to consider the various submissions/materials on jurisdiction. This is to be fixed through my clerk at Stone Chambers. I envisage that the hearing will take place within the near future. This will be an inter partes hearing. It is the intention of the Tribunal to consider the Jurisdiction Challenges at that hearing. If any party wishes to participate by videolink or telephone this should be arranged with my clerk (J-P or Luke on 0207-440-6900).

6. I have considered whether it would be appropriate on the basis of the LCIA Rules and the evidence before me to issue the Order dated 30th March 2010 in the same form but with the heading "Award". Article 25 LCIA Rules includes the following:

**Article 25 Interim and Conservatory Measures**

*25.1 The Arbitral Tribunal shall have the power, unless otherwise agreed by the parties in writing, on the application of any party:*

*(a) to order any respondent party to a claim or counterclaim to provide security for all or part of the amount in dispute, by way of deposit or bank guarantee or in any other manner and upon such terms as the Arbitral Tribunal considers appropriate. Such terms may include the provision by the claiming or counterclaiming party of a cross-indemnity, itself secured in such manner as the Arbitral Tribunal considers appropriate, for any costs or losses incurred by such respondent in providing security. The amount of any costs and losses payable under such cross-indemnity may be determined by the Arbitral Tribunal in one or more awards;*

*(b) to order the preservation, storage, sale or other disposal of any property or thing under the control of any party and relating to the subject matter of the arbitration; and*

*(c) to order on a provisional basis, subject to final determination in an award, any relief which the Arbitral Tribunal would have power to grant in an award, including a provisional order for the payment of money or the disposition of property as between any parties.*

*25.3 The power of the Arbitral Tribunal under Article 25.1 shall not prejudice howsoever any party's right to apply to any state court or other judicial authority for interim or conservatory measures before the formation of the Arbitral Tribunal and, in exceptional cases, thereafter. Any application and any order for such measures after the formation of the Arbitral Tribunal shall be promptly communicated by the applicant to the Arbitral Tribunal and all other parties. ... .....*

7.  In relation to the Interim Order dated 30th March 2010 this is (1) not a final award on the merits; (2) it is subject to further order, thus paragraph G of the Interim Order provides "Any party may at any time apply to discharge or vary any of the orders and directions above."

8.  This was an order made at an inter partes hearing which was not attended by the Respondents who were given prior notice of it and given every opportunity to attend or participate if they wished by telephone or videolink.

9. The Claimants have stated that there has been non-compliance with the Interim Order. At the moment none of the Respondents has given any indication to the Tribunal of compliance with the Interim Order.

10. The Tribunal draws attention to the words in Article 25.3- "..*and, in exceptional cases, thereafter.*" Those words envisage the possibility of application to a state court or other judicial authority for interim or conservatory measures even (1) after the Tribunal has been formed, and (2) without first applying to the Tribunal. In particular there is no need for a document headed "Award" to enable this to occur.

11. In this case application has been made by the Claimants to the Tribunal and the Interim Order has been made by the Tribunal. Issuing the Interim Order with the title "Award" is not necessary, nor would it in any way affect the status of this Order under the LCIA Rules, nor would it in any way affect the binding effect of the Interim Order.

12. Enforcement by a court or other judicial authority of the Interim Order is a matter for that court or judicial authority, which can be expected to look at the substance of what has happened. The Tribunal considers that the Interim Order should be observed by the Respondents unless and until set aside by the Tribunal. This Interim Order is and remains in full force and effect and should be complied with by the Respondents.

Steven Gee QC

**James Parker**

| | |
|---|---|
| **From:** | Steven Gee QC [steven.gee@stonechambers.com] |
| **Sent:** | Monday, May 24, 2010 12:24 PM |
| **To:** | steven.gee@stonechambers.com; jkubin@gibbsbruns.com; steven.gee.q.c@btinternet.com; casework@lcia.org; j-p.schulz@stonechambers.com; luke.irons@stonechambers.com; Kasra Nouroozi; WaguihESiag@aol.com; rsiag@siagtravelegypt.com; manamino29@hotmail.com; rgibbs@gibbsbruns.com; shumphries@gibbsbruns.com; rsmith@kslaw.com; arnauddh@cabinet-dherbomez.com; avocats@cabinet-dherbomez.com; mailto:Nicolas.Ulmer@budin.ch; Nicolas.Ulmer@budin.ch; mailto:Pierre.Andre.Beguin@budin.ch; Pierre.Andre.Beguin@budin.ch; mailto:Thomas.Beguin@budin.ch; Thomas.Beguin@budin.ch; mailto:Christophe.huguenin@budin.ch; Christophe.huguenin@budin.ch |
| **Subject:** | RE: LCIA Arb. No. 91491: King & Spalding LLP v Waguih Elie George Siag; Mona Elie George Siag; Rami Elie George Siag; Touristic Investment & Hotels Management (SIAG) S.A.E.; and Siag-Taba Co |

**Attachments:** Footer.txt

LCIA Arb. No. 91491: King & Spalding LLP v Waguih Elie George Siag; Mona Elie George Siag; Rami Elie George Siag; Touristic Investment & Hotels Management (SIAG) S.A.E.; and Siag-Taba Co

Challenge under Article 10.3 dated 11th May 2010

Dear All,

I refer to the email from the LCIA dated 13th May 2010 which contains a request for Arbitrator Revocation, under Rule 10.3 of the LCIA Rules made by Touristic Investment & Hotels Management (Siag) S.A.E.

There is no reason for me to withdraw from the reference and I do not do so.

Yours sincerely,
Steven Gee QC

Schedule-email from LCIA dated 13th May 2010

**From:** Casework <Casework@lcia.org>
**To:** "steven.gee@stonechambers.com" <steven.gee@stonechambers.com>; HUGUENIN Christophe <christophe.huguenin@budin.ch>; "steven.gee.q.c@btinternet.com" <steven.gee.q.c@btinternet.com>; "jkubin@gibbsbruns.com" <jkubin@gibbsbruns.com>; "j-p.schulz@stonechambers.com" <j-p.schulz@stonechambers.com>; "luke.irons@stonechambers.com" <luke.irons@stonechambers.com>; "kasra.nouroozi@mishcon.com" <kasra.nouroozi@mishcon.com>; "WaguihESiag@aol.com" <WaguihESiag@aol.com>; "rsiag@siagtravelegypt.com" <rsiag@siagtravelegypt.com>; "manamino29@hotmail.com" <manamino29@hotmail.com>; "rgibbs@gibbsbruns.com" <rgibbs@gibbsbruns.com>; "shumphries@gibbsbruns.com" <shumphries@gibbsbruns.com>; "rsmith@kslaw.com" <rsmith@kslaw.com>; "arnauddh@cabinet-dherbomez.com" <arnauddh@cabinet-dherbomez.com>; "avocats@cabinet-dherbomez.com" <avocats@cabinet-dherbomez.com>; BEGUIN Pierre-André <pierre.andre.beguin@budin.ch>; ULMER Nicolas <nicolas.ulmer@budin.ch>; BEGUIN Thomas <thomas.beguin@budin.ch>

**EXHIBIT J**

**Cc:** Casework <Casework@lcia.org>
**Sent:** Thursday, 13 May, 2010 17:16:51
**Subject:** LCIA Arb. No. 91491: King & Spalding LLP v Waguih Elie George Siag; Mona Elie George Siag; Rami Elie George Siag; Touristic Investment & Hotels Management (SIAG) S.A.E.; and Siag-Taba Co

Dear Sirs

I acknowledge receipt of the email below of 11 May 2010 from Maître Patrice d'Herbomez for the Fourth Respondent, Touristic Investment & Hotels Management (Siag) S.A.E..

The Fourth Respondent's challenge to Mr Gee, pursuant to Articles 10.3 and 10.4 of the LCIA Rules, has been noted.

In accordance with the procedure set out in Article 10.4, we would invite Mr Gee to advise us within 15 days from 11 May 2010 (*i.e.* by 26 May 2010) whether or not he will step down in light of the challenge. We would similarly invite the other parties within the same 15-day timeframe to advise whether or not they agree to the challenge.

In the event that Mr Gee does not stand down and that all other parties do not agree to the challenge, the matter will be referred to the LCIA Court for its determination.

Yours faithfully

Rémy Gerbay
Deputy Registrar

LCIA
70 Fleet Street
London EC4Y 1EU
Tel: +44 (0) 20 7936 7007
Fax: +44 (0) 20 7936 7008
www.lcia.org

---

**From:** Maitre Arnaud d'Herbomez [mailto:arnauddh@cabinet-dherbomez.com]
**Sent:** 11 May 2010 18:40
**To:** Casework; jkubin@gibbsbruns.com; rgibbs@gibbsbruns.com; shumphries@gibbsbruns.com; rsmith@kslaw.com; steven.gee@stonechambers.com; j-p.schulz@stonechambers.com; luke.irons@stonechambers.com; kasra.nouroozi@mishcon.com; WaguihESiag@aol.com; rsiag@siagtravel.com; rsiag@siagtravelegypt.com; manamino29@hotmail.com; arnauddh@cabinet-dherbomez.com; pdh@cabinet-dherbomez.com
**Subject:** LCIA Arbitration No. 91491

**Arbitration No. 91491**

**King & Spalding LLP v Waguih Elie George Siag, Mona Elie George Siag, Rami Elie George Siag, Touristic Investment & Hotels Management (Siag) S.A.E., and Siag-Taba Co**

To: the Parties to the Arbitration below,
and their representatives set out below.
cc LCIA.

I am writing on behalf of Respondent Touristic Investment & Hotels Management (Siag) S.A.E.

6/2/2010

## REQUEST FOR ARBITRATOR REVOCATION

Appointed on February 4th, 2010, Mr. Steven Gee QC has begun to "arbitrate" the current litigation.

Respondent Touristic Investment & Hotels Management (Siag) S.A.E. requests the LCIA to revoke the sole arbitrator Mr. Steven Gee QC pursuant to Article 10 of the LCIA Rules.

Article 10.3 of the LCIA Rules states that "*an arbitrator may also be challenged by any party if circumstances exist that give rise to justifiable doubts as to his impartiality or independence.*"

1. Despite the concomitant proceedings in Texas and several notices from one of the Respondent, Mr. Gee has deliberately decided not to suspend his activities although the current debate on the arbitrability of this litigation before the Courts in Texas is crucial.

By stating in § 18 of his "Interim Order" that "*…Where a jurisdictional challenge is raised before the Tribunal, the Tribunal should normally proceed to resolve that challenge one way or the other. This is a case in which the motions pending before Judge Harmon may or may not result in a judgment by Judge Harmon which has application to the issues of jurisdiction raised in this arbitral proceeding. Any judgment of Judge Harmon will be accorded the utmost respect. It may be, depending on what happens in the future, that such a judgment will be binding on the parties in relation to the jurisdictional issues, or it may be that this is not the case…*" Mr. Gee agrees that the jurisdictional debate before the Texas Courts is crucial to determine the arbitrability of this litigation.

But on the other side, Mr. Gee states – still in his "Interim Order" – that "*For the moment, the Tribunal considers that progress should be made on the jurisdictional issues in the arbitration.*"

More incongruous, Mr. Gee states in his email dated 6th May 2010 that "*The matters to be addressed are: a. Whether the Tribunal should make an award (1) confined to jurisdiction of the Tribunal alone, or (2) on both jurisdiction and the merits;*" and that "*The Tribunal also proposes to issue an award in the terms of Section (C) of the Order dated 30th March 2010.*"

Respondent Touristic Investment & Hotels Management (Siag) S.A.E. fails to understand which "utmost respect" Mr. Gee is considering, since he is not waiting for the decision of Judge Harmon and intends to make decisions which will render any judgment from Judge Harmon of no consequence.

This behaviour clearly demonstrates that Mr. Gee has never intended to consider the current proceedings in Texas because he is pursuing his activities and is intending to issue an award although he did not determine his own jurisdiction, which is actually pending before the Texas Courts.

Mr. Gee further states in his "Interim Order" that "*Subject to further submissions, the Tribunal is presently minded to make a separate award on jurisdiction because the matters which appear to arise in relation to jurisdiction seem to be discrete points which can be promptly resolved without the need to resolve the entire merits of the underlying dispute. If the Respondents are correct that is an end to the arbitral proceedings*".

As no further submission has been presented, Mr Gee has no reasons to change his mind and to make an award on both jurisdiction and merits.

This last email from Mr. Gee conducts Respondent Touristic Investment & Hotels Management (Siag) S.A.E. to request his revocation.

2. On 30th March 2010, at 9:57:00 PM, after a hearing – logically started at 11:00 AM – which lasted for over eight hours (see Claimant's Submission on Jurisdiction on § 31) what means less than two hours later, Mr. Gee has sent an "Interim Order" to the parties.

First of all, Respondents did not receive any report or transcript of this hearing between Claimant, Counsels for Claimant and the sole arbitrator Mr. Gee.

The only evidence of the hearing is the "Interim Order" sent in the same breath. Thus, Respondents have been (and are) deliberately kept in the dark and have no opportunity to scrutinize the sequence of the hearing as they should be able to.

- Mr. Gee did not take into account any of the arguments or counterclaims of Respondents in the proceedings in Texas whereas he did so for all the positions of King & Spalding.

Mr. Gee has just collected some information from the Texas proceeding to bring arguments for his "Interim Order" in favor of the Claimant.

As a consequence, Mr. Gee has given the Claimant a stronger position in the arbitration proceeding, compared to the Respondents.

- By quoting the "interests of justice" in the § 23 of his "Interim Order" as the explanation for ordering that "there is on the evidence a risk of irreparable harm if interim relief is not granted. It cannot be said that the Claimant's case is not sufficient in strength on the present materials such as to justify refusal of relief", Mr. Gee clearly gives his opinion on the merits on the case.

The "risk" alleged by Mr. Gee is undefined but it leads to the conclusion that Respondents are acting in bad faith.

Mr. Gee mixes up the "interests of justice" with the interests of the Claimant and clearly displays his preference for Claimant.

International principles state that there should be no possible doubt as to the absolute independence of the arbitral tribunal, and that no possible conflict of interest or resentment, either direct or indirect, exists towards any of the parties to the arbitration.

Respondent Touristic Investment & Hotels Management (Siag) S.A.E. does not feel confident in the absolute independence and impartiality of Mr. Gee.

- Mr. Gee has ordered in § 25 (B) of his "Interim Order" the Respondents to disclose information which are protected by bank confidentiality.

By stating that Respondents must disclose – amongst other things – "(iv) Full details of payments made under any agreement(s) to settle including the name and address of the bank(s) receiving any settlement payment(s), the date of such payment(s), the name and number of the account(s), the name of the recipient(s), and the amount(s); (v) What has happened to the proceeds of each such payment mentioned in sub-paragraph (iv), setting out, in relation to each payment, the use of those proceeds, the nature of any asset acquired, its location, the name under which the asset is held, and in relation to any money credited to any account the name and address of the bank(s) receiving any settlement payment(s), the date of such payment(s), the name and number of the account(s), the name of the recipient(s), and the amount(s);", Mr. Gee intends to weaken the ability of the Respondents to defend themselves against Claimant.

- Mr. Gee has ordered in § 25 (D) of his "Interim Order" the Respondents to secure a sum of US$ 60 millions which is equal to 75 % of the received amount from Egypt - even though Mr. Gee found that at this stage of the proceedings, he was not in a position to rule on the LCIA's jurisdiction over the matter, the merits of Defendants' claim, or even the likelihood of success of those merits…

Although the Claimant did not compute his claim to this day, Mr. Gee has ordered to secure a

6/2/2010

sum which surprisingly amounts to the 80 % Claimant could be claiming under the illegal Contract of Representation.

- Mr. Gee has also ordered an excessive, unfair and improper freezing Order in § 25 (E) of his "Interim Order" : "*The Respondents and each of them, whether by themselves, their servants, or agents, or otherwise howsoever, are ordered not to transfer, diminish in value, dispose of, or deal with in any way whatsoever (a) any proceeds of, or payments made as part of, the settlement of the ICSID arbitration against the Arab Republic of Egypt on or about 16 November 2009 or (b) any assets of whatsoever nature which have been acquired in whole or in part using such proceeds or payments or assets derived from such proceeds or payments pending further order or direction of the Tribunal. Nothing in this Interim Order is to prevent the Respondents from acting pursuant to written permission given in advance by Claimant to deal with such proceeds, payments, or assets. Furthermore, nothing in this Interim Order is to prevent Respondents from using said proceeds, payments, or assets solely to provide the first-class London bank guarantee ordered above.*"

As Mr. Gee has already ordered in § 25 (D) of his "Interim Order" the Respondents to secure a sum of US$ 60 millions which is equal to 75 % of the received amount from Egypt, this order to secure money on which the Claimants have no rights in any way is totally unjustified and doubtful.

Furthermore, Mr. Gee himself recognizes in § 24 of his "Interim Order" that "*The Claimant on its best case is only entitled to part of the settlement proceed*".

By taking such a decision, Mr. Gee intends to prevent Respondents to use any part of the received amount from Egypt, even to defend themselves in this litigation.

This unjustified "Order" has created a prejudice to Touristic Investment & Hotels Management (Siag) S.A.E. whose activities have been seriously disturbed.

3. Mr. Gee, as an international arbitrator, is a member of the "boy's club" of international arbitration. His website mentions his membership of the LCIA.

His regular contacts with this "boy's club" that provides him many personal and financial interests also cast real doubts on his ability to carry out this arbitration proceeding in a fair, impartial and independent manner because of the personality of the Claimant.

This situation creates in itself a real danger of bias and Mr. Gee did not – and does not – bring any guarantees of the absolute lack of conflicts of interests between himself and the Claimant and/or Claimant's affiliates and/or relationships.

Finally, Touristic Investment & Hotels Management (Siag) S.A.E. has serious concern about the relationships Mr. Gee has had and/or has with the President of the LCIA and its law firm Freshfields Bruckhaus Deringer LLP with which Respondents have a conflict of interests.

Pursuant to Article 5.3 of the LCIA Rules and to his Statement of Independence (dated 4th February 2010), Mr. Gee should have disclosed and should disclose all circumstances that give rise to any justified doubts as to his impartiality and/or independence.

→ This situation – and the mentioned "orders" above – clearly demonstrates Mr. Gee's bias in favour of Claimant.

The current behavior of Mr. Gee casts real doubts on his impartiality, independence and fairness.

6/2/2010

According to Article 10 of the LCIA Rules, Respondent Touristic Investment & Hotels Management (Siag) S.A.E. requests the LCIA to revoke Mr. Steven Gee QC from this arbitration proceeding.

Respondent Touristic Investment & Hotels Management (Siag) S.A.E. asks Mr. Steven Gee QC to withdraw pursuant to Article 10.4 of the LCIA Rules.

Respondent Touristic Investment & Hotels Management (Siag) S.A.E. reserves his rights to present additional arguments and evidence when the LCIA authority will be appointed in order to challenge the sole arbitrator of this arbitration proceeding.

Your faithfully,

Patrice d'Herbomez

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email